Williams, J.
 

 The question raised by the general demurrers to the separate answers is whether the apportionment of senatorial districts made by the Governor, Auditor of State and Secretary of State, acting as a board under and by virtue of Section 11, Article XI of the Constitution, violates provisions in that article and is therefore a nullity.
 

 What the board did in its apportionment was to leave nine senatorial districts (original or combined) as they were during the preceding decennium and rearrange the others.
 

 Never before since the framing of the Constitution of 1851 has such a course been pursued. In fact never in that time had any senatorial district, formed by the combination of two or more districts, been thereafter broken up on re-apportionment. The unprecedented action of the board can be justified only upon the theory and assumption that at the end of each decennium the districts combined by annexation ‘ ‘ segregate' ’ or “fall apart by limitation” and so a new apportionment can be made without regard to the manner or nature of prior combinations. The theory of segregation of combined districts was advanced in
 
 State, ex rel.,
 
 v.
 
 Campbell,
 
 48 Ohio St., 435, 27 N. E., 884, in which the opinion was written by Judge Minshall, al
 
 *508
 
 though his name did not originally appear in the reported case; but the theory was not approved or disapproved in that case for the reason that the determination of the rights of the parties therein did not require the court’s action in that behalf. Here, however, the question is squarely presented and a judicial determination depends upon whether such segregation takes place.
 

 To determine the soundness of the so-called theory of segregation it is necessary to look not only to the letter of the constitutional provisions but to their spirit and purpose. Prior to the Constitution of 1851, the apportionments of legislative districts had been made by the General Assembly with the result that oftentimes political advantage was sought to be gained by the party in power. Accordingly Article XI was incorporated in the Constitution for the purpose of correcting the evils of former days by placing the power of apportionment in the hands of a board composed of the Governor, the Auditor of State and the Secretary of State and making the provisions self-acting. Constitutional Convention Debates (1850-1851), Vol. 1, pp. 99, 100, 130 and 157; Vol. 2, pp. 767, 773.
 

 Judge Ranney, who was himself a member of the Constitutional Convention of 1851, in writing the opinion in the case of
 
 State, ex rel. Evans,
 
 v.
 
 Dudley,
 
 1 Ohio St., 437, at 443 made this comment: “To construct a scheme of constitutional apportionments, to endure for many years, and so far as the election of members of the General Assembly is concerned, subject to no control or alteration by that body, is a work of much difficulty, when it is considered how constantly and materially changes are being wrought in the political divisions of the state, and in the relative increase of population. And yet I am much mistaken if the system adopted by the convention is not found entirely adequate to accomplish all the substantial purposes proposed, and one of the most valuable features of the
 
 *509
 
 Constitution. The state had been subjected to a most humiliating experience, while the power was left with the General Assembly; and the scenes of anarchy and confusion, which had marked its exercise there, undoubtedly determined the people to deprive that body of it absolutely, so far as the election of their own member^ was concerned, for the future.”
 

 The objective sought by the constitutional provisions was the prevention of gerrymandering. By creating a board of
 
 ex officio
 
 members and adopting self-acting provisions it was sought to place the function of apportionment in impartial hands and at the same time mark the way so that in the main at least the provisions of the Constitution would work automatically and the apportioning process ordinarily be a mere matter of calculation. If the proper construction were that the districts fall apart at the end of each decennium, an entirely new adjustment would be necessary and the way for gerrymandering opened up. So the theory of segregation, if accepted and applied, would lead to the very evil which the constitutional provisions were intended to prevent. Thus the argument for segregation reduces itself to an absurdity.
 

 If any doubt remains as to whether the combined districts fall apart, it should be dispelled by the constitutional provisions themselves. (See Article XI.) They clearly define how the apportionment should be made, prescribe conditions under which a district, previously combined with another or other districts, may be given separate representation at the end of the decennial period, and are, as far as they go, self-executing and mandatory and, after the full provisions are set forth, there follows Section 10, which declares that “no change shall ever be made * * * in the senatorial districts, except as above provided.” This very language implies that the senatorial districts continue unchanged from decennium to decennium except insofar as the Constitution itself prescribes a change.
 

 
 *510
 
 The apportioning board, then, was required to take the apportionment made in 1931 as a basis and make whatever reapportionment was required by the Constitution.
 

 Some of the provisions of Article XI relate to the apportionment of members of the Lower House of the General Assembly and to the ratio of representation in that House. These will not be mentioned except as they are made applicable to the senatorial districts by reference. Nor are we concerned with anything here except the manner and method of apportioning senatorial districts.
 

 The following provisions of Article XI of the Constitution are germane to the inquiry here.
 

 Section 2: “ Every county having a population equal to one-half of said ratio, shall be entitled to one representative; every county, containing said ratio, and three-fourths over, shall be entitled to two representatives; every county containing three times said ratio, shall be entitled to three representatives; and so on, requiring after the first two, an entire ratio for each additional representative.
 
 Provided, however, that each county shall have one representative.”
 
 (As amended November 3, 1903. Italics ours.) The only change wrought by the amendment of this section was the addition of the words quoted in italics.
 

 Section 4: “Any county, forming with another county or counties, a representative district, during one decennial period, if it have acquired sufficient population at the next decennial period, shall be entitled to a separate representation, if there shall be left, in the district from which it shall have been separated, a population sufficient for a representative; but no such change shall be made, except at the regular decennial period for the apportionment of representatives.” This section so far as it relates to representatives has been impliedly repealed by Section 2 as
 
 *511
 
 amended November 3, 1903, but it is still in force as to senatorial districts.
 

 Section 5: “If, in fixing any subsequent ratio, a county, previously entitled to a separate representation, shall have less than the number required by the new ratio for a representative, such county shall be attached to the county adjoining it, having the least number of inhabitants; and the representation of the district, so formed, shall be determined as herein provided. ’’
 

 Section 6: “The ratio for a senator shall, forever hereafter, be ascertained, by dividing the whole population of the state, by the number thirty-five.”
 

 Section 7: It is not necessary to quote this section in full. It divided the state into thirty-three original senatorial districts all of which still retain their identity except the thirty-third. The latter district was changed in the apportionment of 1901 by carving out Lucas county as the thirty-fourth district. The remainder of the district has continued to be known as the thirty-third.
 

 Section 8: “The same rules shall be applied, in apportioning the fractions of senatorial districts, and in annexing districts, which may hereafter have less than three-fourths of a senatorial ratio, as are applied to representative districts.”
 

 Section 9: “Any county forming part' of a senatorial district, having acquired a population equal to a full senatorial ratio, shall be made a separate senatorial district, at any regular decennial apportionment, if a full senatorial ratio shall be left in the district from which it shall be taken.”
 

 Section 10: The vital part of this section has already been referred to.
 

 Section 11: “ The Governor, Auditor, and Secretary of State, or any two of them, shall, at least six months prior to the October election, in the year one thousand eight hundred and sixty-one, and, at each decennial
 
 *512
 
 period thereafter, ascertain and determine the ratio of representation, according to the decennial census, the number of representatives and senators each county or district shall be entitled to elect, and for what years, within the next ensuing ten years, and the Governor shall cause the same to be published, in such manner as shall be directed by law. ’ ’
 

 Experience has developed that there are only five steps which the apportioning board is required to or may take.
 

 First: The board must determine the ratio by dividing the whole population of the state according to the last preceding census by the number thirty-five. The result is the full senatorial ratio. Seventy five per cent of this amount constitutes what is called the three-fourths ratio.
 

 Second: The board must ascertain whether any county, forming part of a senatorial district, has acquired a population equal to or more than a full senatorial ratio. If so then such county must be made a separate senatorial district, provided a full senatorial ratio be left in the remaining part of the district. In such event two new senatorial districts are created out of the original. This eventuality has occurred but once in the history of the state, namely, in the separation of Lucas county (now the thirty-fourth district) from the remainder of the thirty-third district as above stated.
 

 By the separation the status of thirty-third (as it now exists) and thirty-fourth became the same as that of an original district with respect to future annexations and combinations. Herein is found a cogent reason for the requirement of a full senatorial ratio on either hand before separation of a county from a district can take place. So in referring to original districts in this opinion existing thirty-third and thirty-fourth will be included unless otherwise apparent.
 

 Third: When two or more districts have been combined into one senatorial district and thereafter at the
 
 *513
 
 end of the decennial period the population of any district has increased so as to equal or exceed three-fourths of a senatorial ratio, such original district shall be separated from a senatorial district provided there is left in the part that remains a population equal to or in excess of three-fourths of a senatorial ratio.
 

 Section 8, as has appeared, provides for apportionment of fractions of senatorial districts and prescribes that the same rules shall be applied as are applied to representative districts. This provision requires a transformation of Section 4 which in terms applies only to representative districts. Section 4,
 
 mutatis mutandis,
 
 would run thus: “Any district, forming with another district or districts, a senatorial district, during one decennial period, if it have acquired sufficient population at the next decennial period, shall be entitled to a separate representation, if there shall be left, in the district from which it shall have been separated, a population sufficient for a senator; but no such change shall be made, except at the regular decennial period for the apportionment of senators.” See
 
 State, ex rel.,
 
 v.
 
 Campbell, supra,
 
 at page 438.
 

 Section 4 as
 
 mutated
 
 requires an original district to be separated from a combined senatorial district when such original district has a population sufficient for a senator, provided the part of the combined district that is left likewise has a population sufficient for a senator.
 

 “Population sufficient for a senator,” it is evident from a reading of the various provisions, is three-fourths of a ratio. It is significant that under Section
 
 2,
 
 before amendment, one-half of a ratio was sufficient for a representative. By the amendment of that section, however, each county became entitled to a representative. Such amendment likewise nullified Section 4, so far as representative districts are concerned. But the latter section is still efficacious as to senatorial districts by virtue of Section 8, and, as an aid to interpretation, we may even look to the original Section 2 in so
 
 *514
 
 far as it refers to a fraction of a ratio for a representative. A separate senatorial district is entitled to a senator and continued existence so long as its population does not fall below three-fourths of a senatorial ratio. The underlying reasons will become more apparent in the discussion of the next step with which this particular branch of the inquiry is linked to a greater or lesser degree.
 

 Fourth: The board must next inquire whether there are any existing senatorial districts which according to the last census have fallen below three-fourths of a senatorial ratio and, if so, such district shall be attached to the adjoining district having the least number of inhabitants.
 

 This principle is also grounded upon Section 8 with which Section 5 must be interpreted. Section 5, on
 
 mutation,
 
 runs thus: “If, in fixing any subsequent ratio, a district, previously entitléd to a separate representation, shall have less than the number required by the new ratio for a senator, such district shall be attached to the district adjoining it, having the least number of inhabitants; and the representation of the district, so formed, shall be determined as herein provided. ’ ’
 

 It is the intent of the constitutional provisions that a senatorial district, whether single or combined, could sink below the full senatorial ratio and still be entitled to a senator. On the other hand when such a district sinks below the three-fourths ratio, it must be annexed to the adjoining district having the least population. These assertions are in keeping with what has heretofore been said in connection with the third step respecting the separation of a single district from a combined district. The same test applies to separating a district previously combined with another or other districts and to annexing a district to. an adjoining district. Markedly in either event the basic principle is
 
 *515
 
 that population amounting to at least three-fourths of a full senatorial ratio is “sufficient for a senator.”
 

 Fifth: The board may exercise its discretion, where necessary, to the full discharge of the mandatory duties expressly imposed by Article XI. The fifth step is therefore fundamentally different from the first four, which are mandatory.
 

 Though there may be no departure from the express provisions of the Constitution, circumstances may arise which were not anticipated and provided for. Nevertheless the board must act and make the apportionment. To meet the difficulty a well-known rule is invoked. The board has implied power to exercise such discretion as may be necessary to carry the express powers into execution.
 

 Up to this moment only one kind of situation has actually been uncovered which permits the exercise of discretion. When each of two or more districts adjoining each other or located in a block falls below the three-fourths ratio at the end of the decennial period, the board is confronted with the requirement that each district be attached to the nearest district having the “least number of inhabitants.” Then a problem is presented for the exercise of discretion. The Constitution does not provide the numerical order in which districts shall be annexed and if the apportioning board cannot exercise discretion it can not act at all for the way is not wholly charted by the organic law. This exact situation among others was before the court in the
 
 Campbell case, supra,
 
 which dealt with the apportionment of 1891. In that apportionment second, fourth, fifth, sixth, ninth and fourteenth were in a block. The ninth, however, had more than a three-fourths ratio. There were, therefore, as appears from the- maps, four districts, to wit, second, fourth, fifth and sixth which were together, each with less than a three-fourths ratio. These four districts had not previously been attached to any district in an apportion
 
 *516
 
 ment. Essentially the manner of annexing the four districts was a matter within the sound discretion of the hoard. In the case at bar no such situation is presented.
 

 The scope of the attempted apportionment of 1941 should not be overlooked. The respondent board broke up the following combined districts, to wit: second-fourth, seventh-eighth, ninth-fourteenth, thirteenth-thirty-first, fifteenth-sixteenth, twentieth-twenty-second, twenty-fourth-twenty-sixth, and twenty-seventh-twenty-ninth. In all of these combined districts, consisting as they do of two original districts, either one or both of the original districts have, according to the census of 1940, less than the three-fourths ratio. The board also broke up the senatorial district composed of four original districts, the seventeenth, eighteenth, nineteenth and twenty-eighth, every one of which had a population of less than the three-fourths ratio. It is evident that under the rule as to the three-fourths ratio not one of these combined districts could be interfered with. Out of the original districts released by the breaking up of the combined districts wholly new districts were created and, by the process of rearrangement, the set-up of twenty-three original districts was altered. What a contrast to the apportionment of 1931, when the only change was the annexation of the thirtieth district to the thirty-third, a course strictly within constitutional limitations.
 

 Incidentally it may be remarked that combined districts eleventh-twelfth and thirtieth-thirty-third were not disturbed, although eleventh, twelfth and thirtieth fell below the three-fourths ratio. No valid reason appears for this seeming inconsistency of action.
 

 There was no warrant for the course pursued by the board. No situation was presented which permitted the exercise of discretion and the Constitution expressly forbade what was done. In fact there was not a single change that could have been made by the
 
 *517
 
 board if it adhered to the Constitution,. These assertions must be conceded on all hands, unless as said in the beginning, the districts fell apart leaving the way open for a complete and all-comprehensive distribution and combination of all the original districts of the state every ten years. Such an outcome was never intended and cannot be. Positive it is that the gerrymander can be restored only by constitutional amendment. The pretended apportionment violated the Constitution and is a nullity.
 

 For the reasons given the demurrers to the answers are sustained and, as the demurrers search the record, they are overruled as to the petition. Accordingly the apportionment is declared a nullity and a writ of mandamus is allowed commanding the respondents to apportion correctly the senatorial districts in accordance herewith and to determine the senatorial representation the corrected districts will be severally entitled to during each legislative session to be held during the present decennial period.
 

 Writ allowed.
 

 Weygandt, C. J., Turner, Matthias and Hart, JJ., concur.
 

 Zimmerman, J., dissents.
 

 Bettman, J., not participating.