THE STATE, EX REL. KING, APPELLEE, *v.* RHODES ET AL., APPELLANTS.

(No. 40475—Decided June 30, 1967.)

98

Mr. *Stewart R. Jaffy* and Mr. *Kenneth G. Weinberg*, for appellee.

Mr. *William B. Saxbe*, attorney general, Mr. *J. Philip Redick* and Mr. *William D. Van Tilburg*, for appellants.

MATTHIAS, J. This case presents but a single question. Did the Ohio Apportionment Board have the power to adopt the plan which the federal courts have found to conform to federal constitutional standards?

The resolution of this question requires the determination of two issues: First, the effect of the federal court's decisions on Article XI of the Ohio Constitution providing for legislative apportionment; second, whether the Ohio Apportionment Board had the power to act during the interim between decennial censuses.

It should be pointed out at the outset that state legislative apportionment is basically a state political function and is not, under ordinary circumstances, a problem for either the state or federal judiciary.

The people of the state of Ohio have placed, through Article XI, the problem of and power over legislative apportionment in an apportionment board. The purpose of the people in enacting Article XI is clear. It was to place legislative apportionment in the hands of a separate board not subject to the control of the General Assembly, the board to be composed of representatives of the people, elected by the people and unconnected with the legislative branch of the government. The background of Article XI of the Constitution is well expressed, as follows, in *State, ex rel. Herbert, Atty. Genl.,* v. *Bricker,* 139 Ohio St. 499, 508:

"* * * Prior to the Constitution of 1851, the apportionments of legislative districts had been made by the General Assembly with the result that oftentimes political advantage was sought to be gained by the party in power. Accordingly Article XI was incorporated in the Constitution for the purpose of correcting the evils of former days by placing the power of

apportionment in the hands of a board composed of the Governor, the Auditor of State and the Secretary of State making the provisions self-acting. Constitutional Convention Debates (1850-1851), Vol. 1, pp. 99, 100, 130 and 157; Vol. 2, pp. 767, 773.

"Judge Ranney, who was himself a member of the Constitutional Convention of 1851, in writing the opinion in the case of *State, ex rel. Evans,* v. *Dudley,* 1 Ohio St. 437 [1853], at 443 made this comment: 'To construct a scheme of constitutional apportionments, to endure for many years, and so far as the election of members of the General Assembly is concerned, subject to no control or alteration by that body, is a work of much difficulty, when it is considered how constantly and materially changes are being wrought in the political divisions of the state, and in the relative increase of population. And yet I am much mistaken if the system adopted by the convention is not found entirely adequate to accomplish all the substantial purposes proposed, and one of the most valuable features of the Constitution. The state had been subjected to a most humiliating experience, while the power was left with the General Assembly; and the scenes of anarchy and confusion, which had marked its exercise there, undoubtedly determined the people to deprive that body of it absolutely, so far as the election of their own members was concerned, for the future.'

"The objective sought by the constitutional provisions was the prevention of gerrymandering. By creating a board of *ex officio* members and adopting self-acting provisions it was sought to place the function of apportionment in impartial hands and at the same time mark the way so that in the main at least the provisions of the Constitution would work automatically and the apportioning process ordinarily be a mere matter of calculation. * * *"

We now turn to a consideration of the first issue, the effect of the United States District Court judgment on Article XI. Article XI, Sections 1 to 11 of the Ohio Constitution, provide the means and method of legislative apportionment. In the actions in the federal courts it has been determined that the last sentence in Section 1 and Sections 2, 3, 4, 5, 6a, 7, 8, 9 and 10 were violative of the federal Constitution. Thus, by the deci-

sions of the federal courts, Article XI now contains the first paragraph of Section 1, Section 6 and Section 11.

Section 1 provides the formula for determination of the ratio of representation by population for each member of the House of Representatives.

Section 6 provides the formula of representation by population for each member of the Senate.

Section 11 creates the Apportionment Board.

The question, of course, is whether these sections are severable and valid even though the other sections of Article XI have been found to be contrary to the United States Constitution by the federal courts.

It is the duty of a court to sustain the validity of constitutional provisions if possible. The Constitution is the direct expressed will of the people, and it is the duty of the court to accede to such will if these sections can purposefully stand alone.

The test of severability is whether the remaining parts of the article, standing alone and without reference to the unconstitutional sections, can be effective and operable. *Geiger* v. *Geiger*, 117 Ohio St. 451, 466.

In other words, do these sections standing alone present a workable method of legislative apportionment?

Article XI now provides the formula for the determination of the ratio of representation in the General Assembly and creates a board to put such formula into effect.

Section 1 provides that the whole population of the state shall be divided by 100 and the quotient shall be the ratio of representation in the House of Representatives. Section 6 provides that the whole population of the state shall be divided by 35 and that shall be the ratio of representation in the Senate. It remains only for the board, under Section 11, to divide the state in such a manner that it complies with the constitutional standards.

The standards contained in such formulas are specific and the application of such formulas is purely a mechanical process. A sound and workable arrangement remains in the Constitution, and such provisions are therefore severable from the invalid parts thereof. Thus, Sections 1, 6 and 11 are severable

from those sections determined unconstitutional by the federal courts and constitute valid and existing parts of the Ohio Constitution.

We now turn to the question as to whether the board had the power to act. Section 11, Article XI, reads as follows:

"The Governor, Auditor, and Secretary of State, or any two of them, shall, at least six months prior to the October election, in the year one thousand eight hundred and sixty-one, and, at each decennial period thereafter, ascertain and determine the ratio of representation, according to the decennial census, the number of Representatives and Senators each county or district shall be entitled to elect, and for what years, within the next ensuing ten years, and the Governor shall cause the same to be published, in such manner as shall be directed by law."

It is urged that the board has only the authority to increase or decrease the number of Representatives for the constitutionally established districts and that since these districts have been held to be unconstitutional the board has nothing to act upon.

Section 1, Article XI, requires apportionment every ten years. Apportionment consists of more than determining the number of Representatives from each district.

As was said in *Duxbury* v. *Donovan*, 272 Minn. 424, 433, 138 N. W. 2d 692:

"Apportionment has been defined as the division of a population into constituencies whose electors are to be charged with the selection of public officers. Of necessity, the process involves (1) determination of boundary lines for each of the constituencies; (2) a resulting ratio of voters in each constituency to officers elected by such constituency; (3) a resulting comparable ratio of voters to elected officials as between every constituency and each of the others making up the whole; and (4) a total number of public officers to be selected depending on the number of constituencies established and the number of public officers to be chosen in each." See *Bailey* v. *Abington*, 201 Ark. 1072, 148 S. W. 2d 176.

Section 11 must be read in relation to the provisions of Section 1. Section 1 requires a reapportionment every ten years.

As above pointed out, apportionment includes the districting of the state. Section 11 provides that the board determine the number of Representatives for each district. Where, as here, the prior established apportionment has been held to be invalid under the Constitution of the United States, the board in carrying out the dictates of Sections 1 and 11 necessarily has the implied power to determine new districts which will conform to constitutional requirements.

It is contended also that under this section the board is authorized to act only once in the ten-year period, and that it has no authority to act in the interim.

There is no question that the board has the authority to adopt the original decennial apportionment plan. It has not only the authority but the duty to do so. However, its duty is not confined to merely preparing a plan. The board's duty is to adopt a *valid plan.* Thus, having the authority to adopt the plan if for some reason the plan is determined to be a nullity it necessarily follows that the board has the implied duty to adopt a new plan which is valid. *State, ex rel. Herbert,* v. *Bricker, supra* (139 Ohio St. 499).

To hold otherwise would leave the state without an apportionment for legislative representation. There is no other body authorized to make such apportionment in Ohio. Prior to 1851, under the provisions of the Constitution of 1802, this power rested with the General Assembly. As above pointed out, the people clearly removed such power by the enactment of Article XI and placed such power in this board.

We are concerned in this case only with the prospective operation of the plan adopted by the Apportionment Board which was found by the federal court not to be violative of any constitutional standard.

The members of the 107th General Assembly were elected under this plan which was approved for federal constitutional standards by the federal court and which was made effective for the 1966 election by the federal court. The result of the federal court decisions is *res judicata* and under such decisions the 107th General Assembly is a *de jure* Legislature.

Thus, even though certain sections of Article XI of the Ohio Constitution have been determined by the United States

District Court to be invalid as contrary to the United States Constitution, Sections 1, 6 and 11 are severable, are valid operable sections of the Constitution and constitute a workable arrangement for legislative apportionment in Ohio.

Under Section 11, the Apportionment Board is bound to adopt a valid apportionment plan decennially, and where a plan so adopted is determined to be constitutionally defective the board has a mandatory duty to adopt a new apportionment plan for the balance of the decennial period which conforms to constitutional requirements.

The judgment of the Court of Appeals is reversed and final judgment rendered for the respondents.

*Judgment reversed.*

TAFT, C. J., HERBERT and BROWN, JJ., concur.
SCHNEIDER, J., concurs in the judgment.
ZIMMERMAN and O'NEILL, JJ., dissent.

TAFT, C J., concurring. Whether the first paragraph of Section 1 and Sections 6 and 11 of Article XI of the Ohio Constitution are still valid depends upon a determination of whether the people would have adopted the first paragraph of Section 1 and Sections 6 and 11 if they had known that the other provisions of Article XI would be invalid.

The problem is analogous to that existing where a severable part of a statute has been declared unconstitutional. See 16 American Jurisprudence 2d 409 *et seq*, Section 181 *et seq*, 10 Ohio Jurisprudence 2d 263 *et seq*, Section 184 *et seq*.

The first paragraph of Section 1 and Section 6 merely establish the size of each House of the General Assembly and require its apportionment every ten years. In my opinion, the people would almost certainly have adopted that part of Article XI even if they had known that the remainder of that article would be invalid.

Whether the people would also have adopted Section 11 is not quite so clear. Under that section, the Governor, Auditor, and Secretary of State (herein for convenience referred to as the Apportionment Board) are "at each decennial period" to "ascertain and determine the ratio of representation, accord-

ing to the decennial census, the number of Representatives and Senators each county or district shall be entitled to elect * . * * within the next ensuing ten years, and the Governor shall cause the same to be published * * *.''

Section 1 requires ''the apportionment of this state for members of the General Assembly * * * every ten years.''

Standing alone, the first paragraph of Section 1 and Sections 6 and 11 of Article XI are, in my opinion, sufficient to support what the Apportionment Board did in September 1965 in formulating and adopting an apportionment for the General Assembly for the decennium ending in 1972.

However, when adopted by the people in 1851*, these provisions were adopted with other provisions that have now been held to be invalid by the federal courts and which so specified how the apportionment was to be made that the Apportionment Board's action could be fairly described as self-operating and automatic.

It is reasonably arguable that the people would never have intended the Apportionment Board to have the power to apportion the General Assembly if they had known that their specifications for apportionment would be invalid.

On the other hand, quotations from the constitutional debates clearly indicate that a dominant purpose for Article XI was to take from the General Assembly the legislative power to apportion itself.

The convention recognized that the problem of legislative apportionment presented an almost impossible project for a many-member legislative body, especially where its own apportionment was involved. Subsequent history has confirmed this, even where self-apportionment was not involved. For example, the General Assembly of Ohio was unable to agree on an apportionment of Ohio for Congressional elections for 38 years after 1913, notwithstanding the great variations that developed in the population of districts and the right of Ohio to more Congressmen than there were districts for their election.

The convention undoubtedly concluded that it would be

---

*In my opinion, the invalidity of the so-called Hanna Amendment and of the last paragraph of Section 1 of Article XI would provide no basis whatever for declaring any remaining portions of Article XI invalid.

much easier for two of three elected state officials to agree upon a fair apportionment for the General Assembly than it would be for over a hundred legislators in two houses of that General Assembly to reach such an agreement.

This dominant purpose to take from the General Assembly any power to apportion itself can be satisfied if the validity of the first paragraph of Section 1 and of Sections 6 and 11 is sustained. If it is not, the General Assembly will again have the power to apportion itself that it had before 1851.

If the only purpose of the people in adopting Article XI had been to provide the self-operating and automatic apportionment system that they specified in the provisions of Article XI which have now been held unconstitutional, the people could have accomplished that purpose by imposing the same restrictions and specific duties on the General Assembly that were imposed on the Apportionment Board.

Furthermore, a very important purpose for those specifications for apportionment which were adopted in 1851 was to insure equality in representation. It is ironical that those specifications have been declared invalid by the federal courts because they do not accomplish that purpose. Hence, the Apportionment Board is now restricted by even more stringent requirements of providing equality of representation than those imposed upon it by the Constitution of 1851.

For the foregoing reasons, I am of the opinion that the people would have adopted the first paragraph of Section 1 and Sections 6 and 11 of Article XI of the Ohio Constitution even if they had known that the remaining portions of Article XI could not be valid.

SCHNEIDER, J., concurring in the judgment. It should be agreed that the federal *and state* constitutional validity of the act of the Governor, Secretary of State and Auditor of State in apportioning Ohio's Legislature is *res judicata* with respect to the 107th General Assembly elected thereunder, presently in office, and functioning.

What bearing does this conclusion have upon the issue attempted to be raised in this case, *i. e.*, the validity of future General Assemblies composed of identical constituencies?

If the question of the status of the 107th General Assembly

is *res judicata,* it necessarily means that the real plaintiff in the consolidated United States District Court cases of *Nolan, Sive* and *Blosser,* and in the instant case, is identical, that is, the public; that the defendants, the state officials, are common to all cases; and that the issues are identical.

Shortly after the United States District Court order of October 27, 1965, the lower court herein recognized the common issues in entering an order on November 4, 1965, surrendering "pursuant to the rules of comity" its jurisdiction of the subject matter (the state questions) in the three federal court cases which "covers many of the same controverted questions and subjects as are involved in the within suit."

That the status of the 107th General Assembly is *res judicata* necessarily means that the United States Court decided not only the federal constitutional validity of the 107th General Assembly but likewise its *state* constitutional validity, to decide which, that court had indisputable *exclusive jurisdiction.*

How, then, in the name of common logic can the question remain open that the single act of the apportioning officers which, by reason of the foregoing, produced a legitimate 107th General Assembly, is incapable of producing legitimate offspring in the form of subsequent General Assemblies, in the absence of significant changes in the population of the state and its distribution among the various district constituencies?

It seems to me that the Court of Appeals completely lost touch with reality in simultaneously conceding the complete vitality of the 107th General Assembly to meet and enact any law it so chooses and asserting that future General Assemblies composed of identical districts may *not* meet and enact an *identical* law.

And it further seems to me that both the majority and the minority opinions engage in diametrically opposite exertions in futility in attempting, respectively, to prove and to disprove a result which had been concluded on November 4, 1965.

I would point out, that the United States District Court's attempt, however gracious, to defer the state questions to state courts as to future General Assemblies is without foundation in law or practicality.

As to the former, it did not utilize the doctrine of abstention (see, generally, annotations, 94 L. Ed. 879, 3 L. Ed. 2d 1827;

*Lisco* v. *McNichols, Governor,* 208 F. Supp. 471, approved in *Lucas* v. *Colorado General Assembly,* footnote 2, 12 L. Ed. 2d 632, 636) in that it did not postpone or decline to exercise its jurisdiction of the state issues in deference to the possibility that their resolution would obviate the necessity of deciding the federal question.

As to practicality, if the conclusion of the Court of Appeals herein were sustained, the United States District Court would necessarily be required to consider the federal constitutionality of some substitute plan of apportionment, the state constitutional validity of which would, in turn, be subject to review by our state courts. This "to and fro," which could be intolerably interminable, would finally screech to a halt only upon the discovery of a plan acceptable to both judicial systems. See Moore's Manual on Federal Practice and Procedure, 79, Section 2.07 [2].

O'NEILL, J., dissenting. A reasonable and proper solution of the problem would be for this court to determine that the apportionment which the court is now asked to impose upon the state by judicial order is a *moot question,* the electorate having considered this exact proposal and disapproved it at the election.

Under our system of government, the electorate of the state has the ultimate power to determine, within federal constitutional limits, the apportionment of our legislative bodies, and the fact that the electorate has disapproved an apportionment submitted to it is hardly a sound reason for this court to use to justify a judicial order that imposes upon the electorate the exact apportionment of the General Assembly which the electorate has considered and rejected.

This position, in effect, uses judicial power to amend the Constitution to make effective the exact apportionment that the voters have just rejected.

Amended Substitute Senate Joint Resolution No. 12, which was adopted by the General Assembly on March 2, 1967, called a special election to be held on the first Tuesday after the first Monday in May 1967 and provided for the submission of the following proposition to the electors of the state at that election:

"Shall the Constitution of Ohio *be amended to establish the present legislative districts until the next census* and to pro-

vide a method for the apportionment of the House of Representatives and Senate into single member districts beginning in 1973 and every ten years thereafter * * *." (Emphasis added.)

The specific provisions of that proposed constitutional amendment, which are pertinent here, read as follows:

"Section 2. The apportionment of this state for members of the General Assembly shall be made every ten years, commencing in the year one thousand nine hundred seventy one in the following manner: The whole population of the state, as determined by the federal census or, if such is unavailable, such other basis as the General Assembly may direct, shall be divided by the number 'ninety-nine' and the quotient shall be the ratio of representation in the House of Representatives for ten years next succeeding such apportionment. The whole population of the state as determined by the federal census, or, if such is unavailable, such other basis as the General Assembly may direct, shall be divided by the number 'thirty-three' and the quotient shall be the ratio of representation in the Senate for ten years next succeeding such apportionment. * * *"

"Section 3. At the time the Governor, Auditor of State, Secretary of State, Treasurer of State or other person as provided in Section 1 of this Article, and Attorney General, or any three of them, ascertain and determine the ratios of representation pursuant to this article, *they shall also determine the boundary lines of each district from which members of the House of Representatives and Senate shall be elected for the ten years next succeeding such apportionment,* and shall assign to each of the House of Representatives districts and the Senate districts a number * * *." (Emphasis added.)

"Section 9. *The boundaries of House of Representatives districts and Senate districts from which Representatives and Senators were elected to the 107th General Assembly shall be the boundaries of House of Representatives and Senate districts until January 1, 1973, and Representatives and Senators elected in the general election in 1966 shall hold office for the terms to which they were elected.* * * *" (Emphasis added.)

The electors of this state, in May of this year, rejected that proposition by a vote of 850,068 "no" votes to 699,021 "yes" votes, which official result is found in the volume contain-

ing the Canvas of Returns (Sections 3505.32 and 3505.35, Revised Code) made on May 17, 1967, which volume is kept in the office of the Secretary of State.

The precise apportionment plan which is now before this court was rejected by the electorate of this state at that election in May 1967.

The majority of the court takes the position that this court should reverse the Court of Appeals and, by a judicial order, impose upon the electorate of this state the exact apportionment plan which the electors rejected by a majority of 151,047 votes, or by a negative vote of more than 54 per cent of the votes cast on that issue in the May election this year.

The Supreme Court of the United States has, on occasion, invalidated apportionment plans *which have been approved* by a majority of the voters of a state on the ground that such plans were violative of the federal Constitution, and that court has, on numerous occasions, ordered legislative bodies of different states *to enact apportionment laws or present to the voters of the state proposed apportionment plans* by constitutional amendment, but the Supreme Court of the United States has not as yet interfered with the political functions of the legislative body or the electorate of a state to the point of imposing upon the electorate of a state a plan of apportionment which has been rejected by the voters of that state.

I do not agree that this court should use its judicial power to make a judicial order which has the effect of imposing upon the electorate of this state an exact plan of apportionment which the voters of this state rejected in the form of a proposed constitutional amendment at the election in May 1967.

I agree with the statement in the majority opinion, which reads: "* * * state legislative apportionment is basically a state political function and is not, under ordinary circumstances, a problem for either the state or federal judiciary."

The United States District Court, in the instant case, said: "* * * the federal court should devise and put into effect a reapportionment plan only as a last resort when the Legislature fails or is unable to act." (*Nolan* v. *Rhodes, Governor* (1965), 251 F. Supp. 584, 587.)

It is evident that the General Assembly does not believe that the Constitution, as it now stands, provides for the imposi-

tion of the apportionment plan for future elections which. the federal court ordered the state to use temporarily in the 1966 legislative elections. If the General Assembly had been of the opinion that the present Constitution 'authorizes such an apportionment, it obviously would not have put the taxpayers to the expense of holding a special election to amend the Constitution to provide for that exact apportionment plan.

The reason given by the majority opinion for holding that those sections of Article XI which remain valid under the federal Constitution grant power to apportion to the Governor, Auditor and Secretary of State is stated as follows: "To hold otherwise would leave the state without an apportionment for legislative representation."

Although that is a correct statement, the state is not without power to adopt an apportionment for legislative representation. The General Assembly of Ohio, in the absence of valid constitutional provisions providing for automatic apportionment, has the power under Section 1 of Article II of the Constitution to apportion the General Assembly by enacting into law an apportionment by a simple constitutional majority vote (Section 9, Article II). The General Assembly has the power to submit a constitutional amendment to the electorate providing for an apportionment of the General Assembly (Section 1 of Article XVI). The General Assembly has the power to call a Constitutional Convention which could propose an apportionment of the General Assembly and submit it to the electorate (Section 2 of Article XVI). Under Sections 1 and 1a of Article II, the people have the power, by filing a petition signed by ten per cent of the electorate, to require the Secretary of State to submit to the electorate a proposed apportionment Constitutional amendment.

The concurring opinion of Taft, C. J., asserts: "The convention recognized that the problem of legislative apportionment presented an almost impossible project for a many-member legislative body, especially where its own apportionment was involved. Subsequent history has confirmed this, even where self apportionment was not involved. * * * " However, that statement overlooks the fact that the 105th General Assembly adopted an apportionment for the House of Representatives by the required three-fifths vote and submitted it as a proposed

constitutional amendment to the electorate of Ohio at the May election of 1965, and the 107th General Assembly adopted, as a proposed constitutional amendment, an apportionment for the General Assembly by the required three-fifths vote and submitted it to the electorate in May 1967. The 105th and the 107th General Assemblies have demonstrated their capacity to act responsibly in adopting and submitting to the electorate proposed legislative apportionments.

It can be argued that even if the court, by judicial order, in effect amends the Constitution and imposes upon the electorate this apportionment, the people can, if they desire, put the matter before the voters a second time and repeal the apportionment which the court has imposed upon them. However, why should this court use its judicial power in such a manner in the face of a clear mandate by the electorate? The time element does not, at present, require this action. The General Assembly is now in session and can enact an apportionment and the general election is scheduled to be held in November 1967, at which time, if it is the desire of the General Assembly, a proposed constitutional amendment providing for a constitutionally valid apportionment can be submitted to the electorate. Admittedly, this is not as certain or efficient, or as quick a way to accomplish apportionment as is a court order.

The majority opinion holds that under those sections of Article XI, which have not been declared constitutionally invalid by the federal court, namely, paragraph one of Section 1, Section 6 and Section 11, the Governor, Auditor and Secretary of State have the power to apportion the state and "* * * necessarily * * * [have] the implied power to determine new districts which will conform to constitutional requirements."

The sole premise for this conclusion is stated in the majority opinion in the following language:

"Section 1, Article XI, requires apportionment every ten years. Apportionment consists of more than determining the number of Representatives from each district." *Duxbury* v. *Donovan*, 272 Minn. 424, 138 N. W. 2d 292, is cited as defining apportionment.

The concurring opinion by Taft, C. J., asserts the same premise in the following language: "Section 1 requires 'the

apportionment of this state for members of the General Assembly * * * every ten years.' "

The fallacy of this premise is demonstrated by simply reading the language of Section 1, Article XI, which states: "The apportionment of this state for members of the General Assembly shall be made every ten years, after the year one thousand eight hundred and fifty-one, *in the following manner*: * * *." (Emphasis added.) The majority and concurring opinions simply overlook the words, "in the following manner," in that section.

It is obvious that the language of Section 1 does not either impose a general duty to "apportion" the state or grant a general, express or implied discretionary power to apportion the state. It says very specifically that "the apportionment of this state * * * shall be made * * * in the following manner." The "following manner" is then set out specifically in Sections 2, 3, 4, 5, 6, 7, 8, 9 and 10 of Article XI, all of which, except Section 6, have been declared unconstitutional. It is only necessary to read those sections and the specific manner for apportionment which they provide to become aware that such sections make it indisputably clear that the exact and specific manner under which the apportionment is to occur is set out in those sections; that the apportionment pursuant to those sections is self-regulating and automatic and that to ascertain and determine the apportionment is a matter of mere mathematical computation. Therefore, the manner of apportionment required under Section 1 to be followed is no longer constitutionally valid.

The concurring opinion of Taft, C. J., recognizes this in the following language:

"However, when adopted by the people in 1851, these provisions [paragraph one of Section 1 and Sections 6 and 11] were adopted with other provisions that have now been held invalid by the federal courts and *which so specified how the apportionment was to be made that the Apportionment Board's action could be fairly described as self-operating and automatic.*" (Emphasis added.)

That concurring opinion then argues that this court should speculate upon whether the people would have given the consti-

tutional power to two out of three elected officials to fix district boundaries and specify the number of legislators to be elected from a district if they had known that the sections of Article XI making the apportionment self-regulating and automatic would later be declared invalid. That concurring opinion argues that such speculation supports an opinion that the people 116 years ago would have granted such power if they had known that the other provisions of Article XI would be found invalid 114 years later. Such speculation is an ingenious rationalization but not a sound legal justification for rewriting the constitution.

A supporting argument of the concurring opinion of Taft, C. J., is that a legislative body would find it impossible to agree upon an apportionment for itself. As has been pointed out history does not bear this out because both the 105th and 107th General Assemblies have adopted plans of apportionment by the three-fifths vote required to submit a constitutional amendment to the electorate.

The concurring opinion of Schneider, J., apparently recognizes the problems that this court faces in imposing a plan of apportionment upon the electorate, especially when such plan has been disapproved.

That concurring opinion takes the position that the Court of Appeals surrendered its jurisdiction to determine the validity of the apportionment under the Ohio Constitution, and that state courts now have no jurisdiction to determine that question because the federal court decided not only the federal constitutional validity but likewise the state constitutional validity of the apportionment plan, even though the federal court specifically deferred passing upon the state constitutional questions to permit the Ohio courts to determine them.

The error in that concurring opinion appears in the first sentence where it is said: "It should be agreed that the federal *and state* constitutional validity of the act of the Governor, Secretary of State and Auditor of State in apportioning Ohio's Legislature is *res judicata* with respect to the 107th General Assembly elected thereunder, presently in office, and functioning."

Both the majority and the minority opinions agree that the *order* of the federal court temporarily establishing for the

1966 election an apportionment under which the 107th General Assembly was elected, which order was not appealed from, is now *res judicata*, but that court did not pass upon *the validity of the act* of the Governor, Secretary of State and Auditor of State in apportioning Ohio's General Assembly for the election of 1966 or thereafter until the end of. the decennium in 1972, but specifically reserved that question for the decision of the Ohio courts.

I agree with the majority opinion that the judgment of the United States District Court with regard to the apportionment for the election of the General Assembly in 1966 is *res judicata* and no question can now be successfully raised concerning the election of the members of the 107th General Assembly elected in 1966 or the *de jure* status of that General Assembly or the validity of its acts upon the ground that the apportionment of the General Assembly ordered by the federal court was invalid.

The controlling question which this case presents for determination is: Did the Governor, Auditor and Secretary of State in September 1965 have the power to formulate and adopt and thereby impose a new apportionment for the General Assembly upon this state for the remainder of the decennium until 1972?

The answer to that question is that they *did not have the power*.

Two powers are essential for a valid apportionment:

1. The power to district the state; that is the power to create new districts by establishing the territory to be included in each House and each Senate district and designating the geographical boundaries of each House and Senate district.

Those three officials do not have, and never did have, that power under any provision of the Ohio Constitution or the laws of this state.

2. The power to specify the number of Representatives which shall be elected from each House district and the number of Senators which shall be elected from each Senate district.

Those three public officials do not have and never did have the power to specify the number of House members to be elected from each House district or the number of Senators to be elected from each Senate district under any provision of the Ohio Constitution or the laws of this state.

The Governor, Auditor and Secretary of State neither had, nor now have, power under the constitutional provisions of Article XI to create new geographical boundaries for a House district.

Section 1 of Article XI provides, "The apportionment of this state for members of the General Assembly shall be made every ten years * * * *in the following manner*: * * *." (Emphasis added.)

The last sentence of Section 2 of Article XI establishes each county as a separate House district. There is no duty upon or power given to those public officials to establish the geographical boundaries of the House districts. No district is permitted to be smaller than a single county. No district is permitted to be larger than a single county. There is no power and no discretion given to those three public officials or to anyone else to change the geographical boundaries of the House districts or create new districts. The boundaries are established by the Constitution.

How, then, can it be asserted that the declaring of the provisions of Section 2 of Article XI unconstitutional gives power to those three public officials to create new House districts and fix new boundaries, which power they never had and which power, in fact, they were expressly forbidden from exercising.

Prior to the adoption by the electorate in 1903 of the amendment to the Constitution (last sentence of Section 2 of Article XI), which made each county in Ohio a separate district entitled to at least one Representative, the Governor, Auditor and Secretary of State had no power to create new House districts and no discretion to change the boundaries of the House districts. Section 19 of the Schedule of the Ohio Constitution of 1851 provided for the apportionment of the House of Representatives and designated by name the counties in each House district and the number of Representatives to which each district was entitled for the first decennial period. Following that first decennial period, Section 4 of Article XI provided for the detachment of a county from those districts established by Section 19 of the Schedule automatically according to a mandated population formula, and Section 5 of Article XI provided for the attachment automatically of a single county district under

Section 19 of the Schedule to an adjoining county under a certain specific population formula set forth in Section 5. Therefore, from 1851, when Article XI was adopted by the electorate, until 1903 when the provision that made each county a separate district in Ohio was adopted, the Constitution itself established the boundaries of each House district and the three public officials named in Section 11 had no power and no discretion to create, fix or alter those districts as established by Section 19 of the Schedule and Sections 4 and 5 of Article XI of the Constitution. Sections 4 and 5 were made inoperative by the adoption by the electorate of the last sentence of Section 2 in 1903. It certainly can not be asserted, however, that because Sections 4 and 5 are also unconstitutional under the federal court's ruling, that this would create a grant of power to the three elected public officials to create new House districts and fix their geographical boundaries since under those sections those officials had no power or discretion to create new geographical districts or alter the geographical boundaries of House districts.

Likewise, the Governor, Auditor and Secretary of State have no power under the constitutional provisions of Article XI to establish the geographical boundaries of a Senate district. Section 7 of Article XI specifically establishes the senatorial districts of the state. It provides: "The state is hereby divided into thirty-three senatorial districts, as follows: * * *." That section then lists each district by number and names the counties that are a part of each district. (The last sentence of that section provides the number of Senators each district shall be entitled to elect for the first decennial period after the adoption of the Constitution.) Section 10 provides: "* * * no change shall ever be made * * * in the senatorial districts except as above provided." This obviously precludes any language in Section 11, which is subsequent to Section 10, being interpreted as granting power to change the geographical boundaries of senatorial districts.

The language, "except as above provided," refers to Section 9 which, under certain specific population requirements, provides for the automatic detachment of a county from a senatorial district to form a new senatorial district, and Section 8 which, with reference to the geographical boundaries of a senatorial district, provides, under certain specific population re-

quirements, for the automatic annexing of one senatorial district to another under the specific rules established for the annexation of House districts set forth in Section 5 (Section 5 was effective as to House districts prior to the amendment of Section 2 in 1903 but not afterward).

Those three public officials never had any power to create new districts or to establish the geographical boundaries of senatorial districts. In fact, they were specifically prohibited by the constitutional provision of Section 10 from fixing or changing the geographical boundaries of senatorial districts.

How, then, can it be asserted that the declaring of Sections 7, 8, 9 and 10 of Article XI unconstitutional gives the power to those public officials to establish boundaries for senatorial districts when no language in the Constitution or the laws of this state ever gave them power to create new districts or to establish the geographical boundaries for senatorial districts.

The only duties and the only powers which the Governor, Auditor and Secretary of State have with regard to apportionment appears in Section 11 of Article XI of the Constitution. It provides:

"The Governor, Auditor, and Secretary of State, or any two of them, shall, at least six months prior to the October election, in the year one thousand eight hundred and sixty-one, and, at each decennial period thereafter, ascertain and determine the ratio of representation, according to the decennial census, the number of Representatives and Senators each county or district shall be entitled to elect, and, for what years within the next ensuing ten years, and the Governor shall cause the same to be published, in such manner as shall be directed by law."

Pursuant to Section 11 of Article XI those three officials have three duties:

1. "The Governor, Auditor, and Secretary of State, or any two of them, shall * * * ascertain and determine the ratio of representation according to the decennial census * * *." According to Section 1 of Article XI this is to be ascertained and determined for the House by "* * * the whole population of the state * * * shall be divided by the number 'one hundred,' and the quotient shall be the ratio of representation in the House of Representatives, for ten years next succeeding such apportion-

ment." According to Section 6 of Article XI this is to be ascertained and determined for the Senate by "dividing the whole population of the state by the number thirty-five."

2. "The Governor, Auditor, and Secretary of State, or any two of them, shall * * * ascertain and determine * * * [a] the *number of Representatives and Senators* each county or district shall be entitled to elect and [b] *for what years* within the next ensuing ten years." (Emphasis added.) There is no power granted by that section to create a new district or change the constitutionally mandated boundaries of the old districts.

In respect to the House, Section 2 of Article XI sets forth specifically the number of Representatives each county shall be entitled to elect. Those three officials have no duty and no power except to compare the "ratio of representation" to the "population" of each county and, by the simple arithmetic of long division, "ascertain and determine" the number of Representatives each county is entitled to elect. It is automatic and those three officials have no power and no discretion to change or alter the number so "ascertained and determined" in any way.

In respect to the House, Section 3 of Article XI sets forth specifically "for what years, within the next ensuing ten years" "additional representatives shall be apportioned." Those three officials have no duty and no power except to follow that section of the Constitution and by the simple arithmetic of multiplying the "fraction above the ratio [for each county] * * * by five" and by comparison "ascertain and determine" whether the result will equal one or more ratios. Section 3 then specifically provides the years for which additional Representatives shall be elected based upon the result of the above mathematical calculations.

Those three officials have no duty and no power and no discretion to change or alter in any way the constitutionally mandated number of Representatives to be elected from each county or the years for which they are to be elected. It is specifically provided in the Constitution and there is no power and no discretion given to those three officials to change it.

The same is true of the Senate. Section 8 of Article XI provides: "The same rules shall be applied, in apportioning the fractions of senatorial districts * * * as are applied to repre-

sentative districts." Thus the rules of Sections 2 and 3, as applied to the House, are made applicable by Section 8 to the Senate. Those three officials have no duty, no power and no discretion other than to determine by simple arithmetic of long division and multiplication the number of Senators constitutionally mandated to be elected from each district and for what years additional Senators from each district shall be elected.

How can it be asserted that because the United States District Court has declared these provisions, Sections 2, 3 and 8 of Article XI, unconstitutional, that those three state officials have been given duties and powers which they never had under the Constitution or the laws of this state.

3. Section 11 of Article XI provides further that "* * * the Governor shall cause the same [decennial apportionment] to be published, in such manner as shall be directed by law." (See Section 107.09, Revised Code.) This third duty, mandated by Section 11 of Article XI, requires the Governor to announce the results of the mathematical computations made by the three state officials so that the people will officially know and it will be officially settled what the apportionment as mandated and automatically required by the Constitution is to be for the ensuing ten years. This duty of the Governor is not in dispute and is not relevant to the controlling question to be determined by this court.

It cannot reasonably be disputed that those three public officials never had any duty or power under Article XI of the Constitution to create new House or Senate districts or to establish the geographical boundaries of House or senatorial districts. Those districts are established specifically by the Constitution and the Constitution specifically prohibited any change in the districts except that provided in the Constitution. When the sections establishing those districts were declared unconstitutional by the federal court those three officials had no duty and no power to establish new districts. There can be no implied power unless there is some express power from which the implication of power arises. The way in which each of the three duties imposed upon those three state officials by Section 11 of Article XI is to be performed and discharged is, in each instance, set forth specifically by a specific section of Article XI,

Each of those sections, except the first paragraph of Section 1, which sets forth the specific way in which the three officials are to determine the ratio for representation of the House, and Section 6, which sets forth specifically the way in which those officials are to determine the ratio of the Senate, has been declared unconstitutional by the federal court. Therefore, those three officials are without power pursuant to the Constitution or the laws of this state to create new districts for the House or Senate, and are without power to establish the number of Representatives or Senators who shall be elected from each House and Senate district. Clearly they never had such power because the framers of Article XI of the Constitution and the electorate who adopted that article exercised exclusive power to create the districts and fix the boundaries and to establish the number of Senators and Representatives who were to be elected from each district and wrote into that article the result of their exercise of that power and prohibited anyone, including those three public officials, from ever changing the districts or the principles of representation which the electorate constitutionally established by the exercise of its power to apportion the General Assembly of this state.

Since the provisions of Section 11 of Article XI refer directly to and depend for meaning upon Sections 2, 3, 4, 5, 6a, 7, 8, 9 and 10, all of which have been declared unconstitutional by the federal court, it is manifest that Section 11 is not severable from those sections. Specifically, Section 11 contains no provision for dividing the state into House and Senate districts and grants no power, express or implied, to those three elected officials to district the state by creating new districts and fixing new geographical boundaries.

*A study of the Constitutional Debates reveals that the reason for proposing Article XI of the Constitution adopted in 1851 was to prevent gerrymandering (State, ex rel. Evans, v. Dudley, 1 Ohio St. 437, 443 and 444) which was practiced by the General Assembly pursuant to its power to district the state for House and Senate seats under the Constitution of 1802 (Sections 2 and 6 of Article I). In order to prevent gerrymandering the delegates to the Constitutional Convention of 1851 took away the power of the General Assembly to district the state for*

*House and Senate seats by writing into the Constitution itself the specific districts for the House in Section 19 of the Schedule of the Constitution, and for the Senate in Section 7 of Article XI, and providing that the only changes permitted to be made in those districts were those mandated by the Constitution to be made automatically at the end of each succeeding decennium —for the House by comparing the ratio of representation (Section 1 of Article XI) with the population of the single county districts to determine if any county should be attached to an adjoining county, and if so, to what county, to form a new district (Section 5 of Article XI), and by comparing the ratio of representation (Section 1, Article XI) with the population of each of the counties of the multiple county districts to determine if any county should be detached from a district to make a new district (Section 4, Article XI), and for the Senate by following the procedure as to annexing districts or detaching counties from districts as provided by Sections 8 and 9 of Article XI.*

*Section 10 of Article XI provided that no changes should ever be made in the senatorial districts except those provided in the Constitution (State, ex rel. Evans, v. Dudley, supra, pages 444, 445), and after the electorate amended Section 2 of Article XI by adding the last sentence in 1903, which provision made each county a separate House district, no changes of any kind were constitutionally permissible in any House district.*

*The Constitutional Convention imposed the duty upon the Governor, Auditor and Secretary of State (Section 11 of Article XI) to make the mathematical computations of the ratio of representation for both the House and Senate under Section 1 and Section 6, respectively, and to compare those ratios of representation with the populations of the counties and districts of the House and Senate, respectively, to determine automatically the constitutionally mandated changes in the House and Senate districts at the end of each decennium for the next decennium.*

*The Governor, Auditor and Secretary of State were given no power, express or implied, discretionary or otherwise, to fix or change the House and Senate districts, except in accord-*

*ance with the mandated automatic self-regulating provisions of the Constitution cited above.*

This is certainly understandable because to give the power to gerrymander to a majority of two out of three state officials, rather than to the members of the General Assembly, would not decrease the temptation to district for partisan advantage and it would make it easier to do because a gerrymander by two state officials would not have to secure a majority vote of both the House and Senate and survive a gubernatorial veto to be effective as would a legislative gerrymander.

It has long been the understood and settled law of this state that those three state officials have no power under the Constitution to establish or change House or senatorial districts, or to establish or change the number of Representatives or Senators to be elected from a district. It has been agreed that their only duties were, and are, to make the constitutionally required mathematical computations, to apply the ratio obtained by these computations to the population of each district, and to announce the results pursuant to the mandate of the Constitution. This was the intent of the delegates to the Constitutional Convention of 1851.

The resolution proposing Article XI of the Constitution included this prefix:

"Resolved that, it is expedient to engraft upon a new Constitution a provision for a self-acting apportionment of Senators and Representatives based upon the following principles * * *." 1851 Constitutional Convention Debates and Proceedings (1850-1851), Volume 1, Page 99.

Stilwell, a convention delegate, stated in urging the adoption of Section 8 of Article XI in substantially its present form:

"The object of this Article ought, it seems to me to be, to fix the senatorial districts, so that if possible there shall be neither necessity nor temptation to tamper with them in the future. I believe that unless it shall prevail, or something of the same character shall be adopted, the senatorial apportionment of the state will be afloat at every decennial period." Ohio Constitutional Convention Debates and Proceedings (1850-1851), Volume 2, page 767.

Dorsey, a convention delegate, in opposing a motion to

amend certain provisions of Article XI, stated at the Constitutional Convention:

"I hope this motion will not prevail. If it should, we might as well throw away the whole report at once, for its whole excellence will be destroyed. The feature to which, more than any other, I have attached, is its power of self regulation. Take that away and all the abuses that have existed under the old system will return, and the changes that take place will always be made under the operation of political motives. It will make no difference whether the apportionment is made by the General Assembly or by boards of commissioners of counties and councilmen of cities." Constitutional Convention Debates and Proceedings (1850-1851), Volume 2, page 773.

This settled law was accepted by the delegates to the Constitutional Convention of 1912. Hursh, a delegate, made this comment after having proposed a substitute proposal, number 227, for apportionment of the representative and senatorial districts:

"* * * If the county has not a half ratio, then we commence, not exactly by arbitrary rule, but by an automatic rule, to combine the smallest county of the state with the largest county adjoining that county having less than half the ratio, and so on until the whole state is apportioned. That appeals to me as being somewhat fair. It gives the Apportionment Board very little discretion, just the same as our present Constitution * * *." Constitutional Convention Proceedings and Debates (1912), Volume 2, page 1687.

This court has accepted and followed the rule of law that those public officials had no power to establish or change the House and senatorial districts. As Judge Ranney, who was himself a member of the Constitutional Convention of 1851, said in his opinion in *State, ex rel. Evans,* v. *Dudley,* 1 Ohio St. 437, at pages 444, 445 and 447:

"* * * no change can be made in the constitutional districts other than those expressly provided for in the Constitution * * *"

"* * *

"* * * By the 10th section of the same article, it is expressly provided that 'no change shall ever be made in the principles

of representation as herein established, or in the senatorial districts, except as above provided.' The exception refers to the 8th and 9th sections, the first of which provides for the apportionment of fractions, after the first ten years, and for annexing districts which may fall below three-fourths of a senatorial ratio to an adjoining district; and the last gives to any county included in a senatorial district, which has acquired a population equal to a full senatorial ratio, the right at any regular decennial apportionment, to be made into a separate senatorial district, if a full senatorial ratio is left in the district from which it is taken. Subject to these qualifications, which have no bearing upon the question under consideration, *the districts formed by the Constitution must forever remain unchanged.*

"These districts, as we have already seen, are composed of territory embraced in the counties named at the time they were made, and are not liable to fluctuate with any subsequent change of county limits. * * *" (Emphasis added.)

Likewise, as set forth in the syllabus of *State, ex rel. Herbert, Atty. Genl.,* v. *Bricker, Governor* (1942), 139 Ohio St. 499, 41 N. E. 2d 377, it is clear that this court understood that the duties of those three public officials had to be carried out in strict accordance with the mandatory provisions of Article XI of the Constitution. As Williams, J., said in his opinion in *Herbert, supra,* at page 509:

"The objective sought by the constitutional provisions was the prevention of gerrymandering. By creating a board of *ex officio* members and adopting *self-acting provisions* it was sought to place the function of apportionment in impartial hands and at the same time mark the way so that in the main at least *the provisions of the Constitution would work automatically and the apportioning process ordinarily be a mere matter of calculation.* * * *

"'* * * They [the constitutional provisions of Article XI] clearly define how the apportionment should be made, prescribe conditions under which a district, previously combined with another or other districts, may be given separate representation at the end of the decennial period, and are, as far as they go, self-executing and mandatory and, after the full provisions are set

forth, there follows Section 10, which declares that 'no change shall ever be made * * * in the senatorial districts, except as above provided.' This very language implies that the senatorial districts continue unchanged from decennium to decennium except insofar as the Constitution itself prescribes a change.'' (Emphasis added.)

Beginning at page 512 with this language, ''Experience has developed that there are only five steps which the apportioning board is required to or may take,'' the opinion sets forth the constitutional limitations upon the power of those three officials in respect to the constitutionally required reapportionment at the beginning of each decennium.

The respondents in the instant case, the Governor, Auditor and Secretary of State accepted this as settled law, because after the United States District Court on October 15, 1964, declared that portion of Section 2 of Article XI known as the Hanna Amendment, which provided that each county should have one Representative, unconstitutional, those three elected officials took no action to reapportion the House, pursuant to Section 11 of Article XI of the Constitution. Had they made a reapportionment as they now propose and had the power to do so, the time and cost expended by the General Assembly proposing a constitutional amendment and submitting it to the people at the election in May 1965, when it was disapproved, would have been saved.

The Attorney General accepted this as settled law, becasue he, in his brief submitted in the case in which the constitutionality of the Hanna Amendment was raised before the United States District Court, stated to that court:

''The Apportionment Board has *no power to convene itself and act to set up a system of apportionment. State, ex rel. Herbert,* v. *Bricker,* 139 Ohio St. 499, 41 N. E. 2d 377 (1942). The *Herbert case* makes it patently clear the duties of the *board are strictly ministerial and automatic.* Once the board has met and followed Article XI of the Constitution of Ohio, it has no authority to reconvene and further act. The board is empowered to meet once every decennial period *to carry out its mechanical arithmetic duties.* If the board follows the Ohio Constitution, as it here did, it may not meet again until after a decennial census is taken.'' (Emphasis added.)

The correct rule of law which is controlling in this case could not be more succinctly and clearly stated than it was in the above language of Attorney General Saxbe in his brief in the United States District Court.

And, at the hearing in that case, the record shows the following dialogue between Judge Weick and Attorney General Saxbe:

"Judge Weick: The Apportionment Board has worked pretty well in Ohio, hasn't it?

"Mr. Saxbe: Yes, but it's been an automatic, purely automatic arrangement."

It is clear that the United States District Court accepted this as settled law, because in its order of October 15, 1964, it did not order the three elected officials to reapportion but ordered the General Assembly of Ohio "to promptly devise a plan for apportionment of the Legislature and submit a proposed constitutional amendment providing for the same to a vote of the people in 1965."

It is, therefore, clear that the delegates to the Constitutional Convention of 1851 and the Constitutional Convention of 1912, the United States District Court, Governor Rhodes, Auditor Cloud, Secretary of State Brown, Attorney General Saxbe, and this court regarded it as settled law in this state that apportionment of the General Assembly is provided for by constitutional mandate in Article XI of the Ohio Constitution; that such apportionment is automatic by operation of law, after certain required simple mathematical computations have been made; and that, at the beginning of each decennium the Governor, Auditor and Secretary of State are designated by Section 11 of Article XI to make the constitutionally required mathematical computations and apply them pursuant to mandatory constitutional provisions; and that the Governor is required to publish the result of those computations and their mathematical application, pursuant to the constitutional provisions, in certain newspapers of the state. This course of conduct with regard to the apportionment of the General Assembly has been followed and, when attacked, upheld by this court since the adoption of Article XI, by the electorate in 1851.

Since all the sections of Article XI, except part of Section 1, Section 6 and Section 11, have been declared unconstitutional

by the federal court's order, the àct of apportionment by which the respondents purported to formulate and adopt and thereby impose upon this state in September 1965 an apportionment for the remainder of the decennium until 1972 is a nullity and void because the respondents had no constitutional or legislative grant of power, express or implied, to create new districts and to establish boundaries for districts for the House and Senate, or to specify the number of Representatives and Senators to be elected from each district.

ZIMMERMAN, J., concurs in the foregoing dissenting opinion.