THE STATE EX REL. LETOHIOVOTE.ORG ET AL. *v.*

BRUNNER, SECY. OF STATE.

[Cite as *State ex rel. LetOhioVote.org v. Brunner,*

123 Ohio St.3d 322, 2009-Ohio-4900.]

*The video-lottery-terminal provisions of 2009 Am.Sub.H.B. No. 1 do not fall within any of the exceptions to the right of referendum in that they are not laws providing for tax levies, appropriations for the current expenses of the state government, or emergency laws necessary for the immediate preservation of the public peace, health, or safety. Therefore, they are subject to referendum.*

(No. 2009-1310 ─ Submitted September 2, 2009 ─ Decided September 21, 2009.)

IN MANDAMUS.

─────────────────

SYLLABUS OF THE COURT

The video-lottery-terminal provisions of 2009 Am.Sub.H.B. No. 1 do not fall within any of the exceptions to the right of referendum in that they are neither laws providing for tax levies, nor appropriations for the current expenses of the state government, nor emergency laws necessary for the immediate preservation of the public peace, health, or safety. Therefore, they are subject to referendum.

─────────────────

O'DONNELL, J.

{¶ 1} LetOhioVote.org, a ballot-issue committee, and Thomas E. Brinkman Jr., David Hansen, and Gene Pierce, Ohio resident-electors and members of LetOhioVote.org, filed this original action seeking a writ of mandamus to compel the secretary of state to treat the video-lottery-terminal

("VLT") provisions of 2009 Am.Sub.H.B. No. 1 ("H.B. 1") as subject to referendum and to discharge her duties pursuant to Article II of the Ohio Constitution and R.C. Chapter 3519. The narrow focus of this case excludes policy considerations, which are the province of the legislative and executive branches, and is singularly centered on whether the citizens of Ohio have the right of referendum on the VLT provisions of H.B. 1, which authorize the Ohio Lottery Commission to locate as many as 2,500 VLTs at each of Ohio's seven horse-racing tracks for a potential of 17,500 machines in Ohio. The legal issue before us is whether these VLT provisions of H.B. 1 are an appropriation for the current expenses of the state government and are therefore not subject to referendum pursuant to Section 1d, Article II of the Ohio Constitution. After careful review of this important question, we conclude that our jurisdiction has been properly invoked, that mandamus is an appropriate remedy, and that the VLT provisions of H.B. 1 are subject to referendum. Because relators have established entitlement to the requested extraordinary relief, we grant the writ and direct the secretary of state to treat the VLT provisions of H.B. 1 as subject to referendum.

## Facts and Procedural Background

{¶ 2} On July 13, 2009, Governor Strickland issued a directive to the Ohio Lottery entitled "Implementing Video Lottery Terminals." In particular, the governor directed the Ohio Lottery Commission to immediately take steps to implement the placement of as many as 2,500 VLTs at each of seven horse-racing tracks in Ohio upon acknowledgement by the General Assembly of the commission's authority to do so. However, the governor expressly conditioned the implementation of the directive upon the passage of the VLT provisions by the General Assembly, explaining that if the provisions were not enacted "into law as part of or prior to the FY10-11 biennial budget law and such law is not signed into law by [the governor] within five days of the issuance of this Directive, the Directive shall then be deemed immediately null and void."

**H.B. 1**

**{¶ 3}** On the same day that the governor issued his VLT directive, the General Assembly enacted H.B. 1, which includes the 2010-2011 biennial budget. H.B. 1 provides a line-item appropriation from the Lottery Profits Education Fund of over $2.2 billion to the Department of Education, which increases the appropriation to the Department of Education for Foundation Funding Fund from this fund for the current biennium by $851.5 million to reflect the expected revenues from the implementation of VLTs in May 2010 and the associated license fees. H.B. 1 also includes amendments to R.C. Chapter 3770 that authorize the State Lottery Commission to operate VLT games and promulgate rules relating to the commission's operation of VLT games, that specify that the provisions of R.C. Chapter 2915 criminalizing gambling activities are inapplicable, that bar political subdivisions from assessing new license or excise taxes on VLT licensees, and that purport to vest this court with exclusive, original jurisdiction over any claim that the provisions are unconstitutional.[1]

---

**1.** **{¶ a}** More specifically, the amendments to R.C. 3770.03 and the newly enacted R.C. 3770.21 in H.B. 1 are as follows, with the language enacted by H.B. 1 in italics:

**{¶ b}** "Sec. 3770.03. (A) The state lottery commission shall promulgate rules under which a statewide lottery may be conducted, *which includes, and since the original enactment of this section has included, the authority for the commission to operate video lottery terminal games. Any reference in this chapter to tickets shall not be construed to in any way limit the authority of the commission to operate video lottery terminal games. Nothing in this chapter shall restrict the authority of the commission to promulgate rules related to the operation of games utilizing video lottery terminals as described in section 3770.21 of the Revised Code.* * * *

**{¶ c}** "* * *

**{¶ d}** "(B) The commission shall promulgate rules, in addition to those described in division (A) of this section, pursuant to Chapter 119. of the Revised Code under which a statewide lottery and statewide joint lottery games may be conducted. Subjects covered in these rules shall include, but not be limited to, the following:

**{¶ e}**"* * *

**{¶ f}**"*(6) Any other subjects the commission determines are necessary for the operation of video lottery terminal games, including the establishment of any fees, fines, or payment schedules.*

**{¶ g}**"(C) *Chapter 2915. of the Revised Code does not apply to, affect, or prohibit lotteries conducted pursuant to this chapter.*"

**{¶ 4}** In enacting H.B. 1, the General Assembly declared that the amendments relating to VLTs – R.C. 3770.03 and 3770.21 – are exempt from referendum because "[they are] or relate[ ] to an appropriation for current expenses within the meaning of Ohio Constitution, Article II, Section 1d and section 1.471 of the Revised Code, * * * and therefore take[ ] effect immediately when this act becomes law."  Section 812.20 of H.B. 1.  H.B. 1 additionally indicates that certain other amendments are subject to referendum and will not become immediately effective.  Sections 812.10, 812.30, and 812.50 of H.B. 1.

**{¶ 5}** The governor signed H.B. 1 into law on July 17, 2009.

### Mandamus Case

**{¶ 6}** On July 20, 2009, relators filed this action seeking a writ of mandamus to compel respondent, Secretary of State Jennifer Brunner, to treat the VLT provisions of H.B. 1 as subject to referendum.  We issued an accelerated

**{¶ h}**"*Sec. 3770.21. (A) 'Video lottery terminal' means any electronic device approved by the state lottery commission that provides immediate prize determinations for participants on an electronic display.*

**{¶ i}**"*(B) The state lottery commission shall include, in any rules adopted concerning video lottery terminals, the level of minimum investments that must be made by video lottery terminal licensees in the buildings and grounds at the facilities, including temporary facilities, in which the terminals will be located, along with any standards and timetables for such investments.*

**{¶ j}**"*(C) No license or excise tax or fee not in effect on the effective date of this section shall be assessed upon or collected from a video lottery terminal licensee by any county, township, municipal corporation, school district, or other political subdivision of the state that has authority to assess or collect a tax or fee by reason of the video lottery terminal related conduct authorized by section 3770.03 of the Revised Code.  This division does not prohibit the imposition of taxes under Chapter 718. or 3769. of the Revised Code.*

**{¶ k}**"*(D) The supreme court shall have exclusive, original jurisdiction over any claim asserting that this section or section 3770.03 of the Revised Code or any portion of those sections or any rule adopted under those sections violates any provision of the Ohio Constitution, any claim asserting that any action taken by the governor or the lottery commission pursuant to those sections violates any provision of the Ohio Constitution or any provision of the Revised Code, or any claim asserting that any portion of this section violates any provision of the Ohio Constitution.  If any claim over which the supreme court is granted exclusive, original jurisdiction by this division is filed in any lower court, the claim shall be dismissed by the court on the ground that the court lacks jurisdiction to review it.*

**{¶ l}**"*(E) Should any portion of this section or of section 3770.03 of the Revised Code be found to be unenforceable or invalid, it shall be severed and the remaining portions remain in full force and effect.*"

4

briefing schedule and granted the motion of the directors of the Office of Budget and Management and the Ohio Lottery Commission to intervene as additional respondents ("intervening respondents").

{¶ 7} On July 23, 2009, relators presented for filing with the secretary of state a referendum-petition summary, consisting of numerous part-petitions containing over 3,000 signatures, and a copy of one of the summary part-petitions for filing with the office of the attorney general. The office of the secretary of state deferred to the General Assembly's declaration that the VLT sections of H.B. 1 are not subject to referendum and declined to accept the filing of the referendum petitions "[i]n the absence of a court order to the contrary." The office of the attorney general similarly rejected the filing presented to it, based on the conclusion that the VLT provisions were not subject to referendum.

{¶ 8} The rejection of the proffered filings precluded relators from circulating the referendum petition for signatures. Relators sought, and we granted, leave to file an amended complaint that included the events that took place after the original complaint was filed.

{¶ 9} In briefs and arguments before this court, relators contend that the VLT provisions are subject to referendum because they are not appropriations for current state expenses, they neither make expenditures nor incur obligations, and they are not temporary measures necessary to effectuate an appropriation; instead, relators argue, the VLT provisions constitute a change in the permanent law of this state that generates, rather than spends, money, and they seek a 90-day stay of the VLT provisions so that they may have a meaningful opportunity to circulate a referendum petition.

{¶ 10} The secretary of state urges that she does not have a clear legal duty to disregard the General Assembly's declaration in the bill that the VLT provisions are not subject to referendum or to adjudicate the question of whether the VLT provisions constitute an appropriation for current state expenses exempt

from referendum. Instead, she maintains that she has a duty to reject referendum petitions that do not comply with express provisions of law and suggests that relators have an adequate remedy at law by way of an action for a declaratory judgment and an injunction in the common pleas court. She also contends that relators are merely seeking a declaratory judgment and an injunction, which this court lacks jurisdiction to issue.

{¶ 11} Intervening respondents contend that the VLT provisions are not subject to referendum, because they appropriate money for education. However, to the extent that the VLT provisions themselves are not direct appropriations, the intervening respondents argue that the referendum process does not apply to laws providing for appropriations for current state expenses or to laws that are "inextricably tied" to a line-item appropriation for the current expenses of the state government or state institutions. Thus, intervening respondents claim that the VLT provisions provide for, or are inextricably tied to, the line-item appropriation for education in H.B. 1 because the VLT provisions generate the revenue that funds the appropriation. Further, without the VLT provisions, the appropriation cannot become immediately effective as required by Section 1d, Article II, of the Ohio Constitution. Lastly, the intervening respondents contend that granting a writ of mandamus would be a vain act because the Lottery Commission already possesses the authority to implement VLT gaming without the amendments enacted by H.B. 1.

{¶ 12} Accordingly, we are called on to address whether relators are entitled to a writ of mandamus to compel the secretary of state to treat the VLT provisions of H.B. 1 as subject to referendum.

**Mandamus**

{¶ 13} To be entitled to a writ of mandamus, "relators must establish a clear legal right to the requested relief, a corresponding clear legal duty on the part of the secretary of state to provide it, and the lack of an adequate remedy in

the ordinary course of the law." *State ex rel. Heffelfinger v. Brunner*, 116 Ohio St.3d 172, 2007-Ohio-5838, 876 N.E.2d 1231, ¶ 13. Mandamus is available to challenge the failure to certify a referendum-petition summary. Cf. *State ex rel. Barren v. Brown* (1977), 51 Ohio St.2d 169, 171, 5 O.O.3d 136, 365 N.E.2d 887 (writ of mandamus granted to compel attorney general to certify that the referendum-petition summary is a fair and truthful statement of the measure to be referred).

{¶ 14} Relators seek a writ of mandamus to compel the secretary of state to treat the VLT sections of H.B. 1 – R.C. 3770.03 and 3770.21 – as subject to the constitutional right of referendum and to fulfill each of her duties and obligations relating to the referendum under Article II of the Ohio Constitution and R.C. Chapter 3519. We conclude that relators' complaint for a writ of mandamus properly invokes our original jurisdiction and that an action in the court of common pleas for a declaratory judgment or a prohibitory injunction would not provide an adequate remedy in the ordinary course of law.

{¶ 15} "In general, if declaratory judgment would not be a complete remedy unless coupled with extraordinary ancillary relief in the nature of a mandatory injunction, the availability of declaratory judgment does not preclude a writ of mandamus." *State ex rel. Mill Creek Metro. Park Dist. Bd. of Commrs. v. Tablack* (1999), 86 Ohio St.3d 293, 297, 714 N.E.2d 917. In this case, a declaratory judgment would not be an adequate remedy without a mandatory injunction ordering the secretary of state to treat the VLT sections of H.B. 1 as subject to referendum. See *State ex rel. Ohio Gen. Assembly v. Brunner*, 114 Ohio St.3d 386, 2007-Ohio-3780, 872 N.E.2d 912, ¶ 25.

{¶ 16} Nor would a prohibitory injunction provide relators with the relief they request here: an order to compel the secretary of state to comply with her duties under Section 1c, Article II of the Ohio Constitution and R.C. 3519.01 to treat the VLT provisions as being subject to referendum. Moreover, given the

state's desire to immediately implement these provisions and relators' wish to immediately begin the referendum process, a common pleas court action would not be sufficiently speedy to determine whether the VLT provisions of H.B. 1 are subject to referendum. See *State ex rel. Beane v. Dayton*, 112 Ohio St.3d 553, 2007-Ohio-811, 862 N.E.2d 97, ¶ 31 ("The alternate remedy must be complete, beneficial, and speedy in order to be an adequate remedy at law").

{¶ 17} Therefore, relators lack an adequate remedy in the ordinary course of law to raise their claim, and mandamus is an appropriate remedy to resolve it.

### The Right of Referendum

{¶ 18} "The constitutional right of citizens to referendum is of paramount importance." *State ex rel. Ohio Gen. Assembly v. Brunner*, 115 Ohio St.3d 103, 2007-Ohio-4460, 873 N.E.2d 1232, ¶ 8. "The referendum * * * is a means for direct political participation, allowing the people the final decision, amounting to a veto power, over enactments of representative bodies. The practice is designed to 'give citizens a voice on questions of public policy.' " *Eastlake v. Forest City Ents., Inc.* (1976), 426 U.S. 668, 673, 96 S.Ct. 2358, 49 L.Ed.2d 132, quoting *James v. Valtierra* (1971), 402 U.S. 137, 141, 91 S.Ct. 1331, 28 L.Ed.2d 678.

{¶ 19} In 1912, the electors of Ohio adopted the initiative and referendum amendment to the constitution. Shortly thereafter, we explained the significance of the amendment:

{¶ 20} "Now, the people's right to the use of the initiative and referendum is one of the most essential safeguards to representative government. * * * The potential virtue of the 'I. & R.' does not reside in the good statutes and good constitutional amendments initiated, nor in the bad statutes and bad proposed constitutional amendments that are killed. Rather, the greatest efficiency of the 'I. and R.' rests in the wholesome restraint imposed automatically upon the general assembly and the governor and the possibilities of that latent power when called

into action by the voters." *State ex rel. Nolan v. ClenDening* (1915), 93 Ohio St. 264, 277-278, 112 N.E. 1029.

{¶ 21} "This reserved power of referendum applies to every law passed in this state and provides an important check on actions taken by the government." *Ohio Gen. Assembly*, 115 Ohio St.3d 103, 2007-Ohio-4460, 873 N.E.2d 1232, ¶ 9. Thus, "[l]aws generally do not take effect until 90 days have passed from the date they are filed by the governor with the secretary of state, to allow for a possible referendum. Section 1c, Article II, Ohio Constitution." Id.

**Exceptions to the Right of Referendum**

{¶ 22} Section 1d, Article II of the Ohio Constitution sets forth exceptions to the general rule that all laws and sections of laws are subject to referendum and thus do not become immediately effective:

{¶ 23} "Laws providing for tax levies, appropriations for the current expenses of the state government and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health or safety, shall go into immediate effect. * * * The laws mentioned in this section shall not be subject to referendum."

{¶ 24} In construing these exceptions, "we must 'read words and phrases in context according to the rules of grammar and common usage.' " *State ex rel. Colvin v. Brunner*, 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979, ¶ 43, quoting *State ex rel. Lee v. Karnes*, 103 Ohio St.3d 559, 2004-Ohio-5718, 817 N.E.2d 76, ¶ 23. We liberally construe the powers of initiative and referendum to effectuate the rights reserved. *State ex rel. Evans v. Blackwell*, 111 Ohio St.3d 1, 2006-Ohio-4334, 854 N.E.2d 1025, ¶ 32. Further, "[i]n view of the great precaution taken by the constitutional convention of 1912 to set forth and safeguard, with the particularity of detail usually found only in legislative acts, the right of referendum, and the three exceptions thereto, our court should not deny the people that right, *unless the act in question is plainly and persuasively*

*included within one of the three classes excepted from the operation of the referendum.*" (Emphasis added.) *State ex rel. Keller v. Forney* (1923), 108 Ohio St. 463, 467-468, 141 N.E. 16. These exceptions to the general rule of referendum must be strictly, but reasonably, construed. Id. at paragraphs one and two of the syllabus.

### The Language of the Exceptions

{¶ 25} The intervening respondents contend that the court should read the exception for appropriations to include "laws providing for" appropriations. We reject this contention. The language used in Section 1d, Article II of the Ohio Constitution demonstrates that the phrase "Laws providing for" modifies only "tax levies." Otherwise, Section 1d would also provide an exception for "Laws providing for * * * emergency laws." Further, to the extent that there are two reasonable interpretations of Section 1d, our caselaw requires that we narrowly construe the exceptions to the right of referendum.

{¶ 26} The plain language of Section 1d, Article II of the Ohio Constitution creates three categories of exceptions from referendum: (1) laws providing for tax levies, (2) appropriations for current expenses of the state government and state institutions, and (3) emergency laws necessary for the immediate preservation of the public peace, health, or safety.

{¶ 27} Intervening respondents also contend either that the VLT provisions themselves are an appropriation or that when read in pari materia with the constitutional requirement that any funds raised by the state lottery can be used only to support education, this legislation is an appropriation. We do not agree.

{¶ 28} An appropriation is "an authorization granted by the general assembly to make expenditures and to incur obligations for specific purposes." R.C. 131.01(F). Similarly, in *State ex rel. Akron Edn. Assn. v. Essex* (1976), 47 Ohio St.2d 47, 49, 1 O.O.3d 28, 351 N.E.2d 118, we explained that the ordinary

and common meaning of the phrase "appropriation bill" is a "measure before a legislative body which authorizes 'the expenditure of public moneys and stipulating the amount, manner, and purpose of the various items of expenditure.' " Id. at 49, quoting Webster's New International Dictionary (2d Ed.). See also Black's Law Dictionary (9th Ed.2009) 117-118 (defining "appropriation" to mean "[a] legislative body's act of setting aside a sum of money for a public purpose").

{¶ 29} The VLT provisions of H.B. 1 are not themselves appropriations for state expenses because they do not set aside a sum of money for a public purpose; neither R.C. 3770.03 nor 3770.21 as amended by H.B. 1 makes expenditures or incurs obligations. Rather, they authorize the State Lottery Commission to operate VLT games and to promulgate rules relating to the commission's operation of VLT games, specify that the provisions of R.C. Chapter 2915 criminalizing gambling activities are inapplicable, bar political subdivisions from assessing new license or excise taxes on VLT licensees, and purport to vest this court with exclusive, original jurisdiction over any claim that the provisions are unconstitutional.

{¶ 30} We reject intervening respondent's position that because the funds generated by the VLTs must be used for education, the VLT provisions of H.B. 1 constitute an appropriation. Section 6, Article XV mandates that any funds raised by the state lottery be used to support education "as determined in appropriations made by the General Assembly." The VLT provisions of H.B. 1 do not appropriate anything. A separate provision of H.B. 1 – line-item 200612 – appropriates these funds to education. Thus, notwithstanding the constitutional mandate that all lottery funds be spent on education, the existence of a separate line item for appropriation of the revenues generated by VLTs demonstrates that the VLT provisions themselves are not appropriations.

**Inextricably Tied or Related to Appropriations**

{¶ 31} The intervening respondents next claim that even if the challenged VLT provisions do not specifically set aside a sum of money for a specific public purpose, they are within the appropriations exception because they are "inextricably tied" to the $2.3 billion in appropriations from the Lottery Profits Education Fund for education provided by H.B. 1.  Relators counter that the VLT sections are not within the Section 1d, Article II exception, because they raise revenue rather than spend it.

*Section 812.20*

{¶ 32} The General Assembly specified in Section 812.20 of H.B. 1 that the amendment concerning VLTs in R.C. 3770.03 and 3770.21 is excluded from referendum because "it is *or relates to* an appropriation for current expenses within the meaning of Ohio Constitution, Article II, Section 1d and section 1.471 of the Revised Code."  (Emphasis added.)  This language, like the intervening respondents' advocated construction of the exception, is broader than the applicable constitutional language, which states that "appropriations for the current expenses of the state government and state institutions * * * shall go into immediate effect * * * [and] shall not be subject to referendum."  Section 1d, Article II.  The constitutional language does not expressly include an exception for laws that *relate to* appropriations for the current expenses of the state government.

{¶ 33} Moreover, this court has previously held that the analogous exception of Section 1d, Article II for "laws providing for tax levies" is "limited to an actual self-executing levy of taxes, and is not synonymous with laws 'relating' to tax levies, or 'pertaining' to tax levies, or 'concerning' tax levies." *Keller*, 108 Ohio St. 463, 141 N.E. 16, at paragraph three of the syllabus; see also *State ex rel. Taft v. Franklin Cty. Court of Common Pleas* (1998), 81 Ohio St.3d 480, 483, 692 N.E.2d 560 (holding that an act that authorizes the electorate to

determine whether taxes should be levied does not levy taxes and consequently that Section 1d, Article II does not apply).

{¶ 34} Therefore, notwithstanding the General Assembly's language in Section 812.20 of the act, the VLT sections of H.B. 1 are not excepted from referendum if they merely relate to an appropriation for current state-government expenses; the exception is for appropriations for the current expenses of the state government – not for enactment of laws (other than tax levies) designed to generate revenue that can be appropriated.

{¶ 35} There is no authority in our precedent that would permit the referendum exception to apply to provisions that, once implemented, raise revenue to provide funds for an appropriation in another part of the act, even if – as the intervening respondents claim – they are "inextricably tied" or related to each other.

<em>Kelly</em> and <em>Cty. Rd. Assn.</em>

{¶ 36} Intervening respondents' reliance on *Kelly v. Marylanders for Sports Sanity, Inc.* (1987), 310 Md. 437, 530 A.2d 245, and *Cty. Rd. Assn. of Michigan v. Bd. of State Canvassers* (1979), 407 Mich. 101, 282 N.W.2d 774, is unpersuasive and misplaced. Both cases involved legislation linked to an appropriation that the courts determined was not subject to referendum.

{¶ 37} In *Kelly*, the Court of Appeals of Maryland held that statutes authorizing the state stadium authority to borrow funds through the issuance of bonds and designating a site for the construction of professional baseball and football stadiums constituted appropriations that were not subject to referendum because those statutes were part of an interdependent and legally inseparable package of legislation that appropriated funds. 310 Md. at 474, 530 A.2d 245. Similarly, in *Cty. Rd. Assn.*, the Supreme Court of Michigan concluded that statutes increasing various taxes on fuel and vehicle registrations constituted part

of the appropriation to the highway department and were not subject to referendum.

{¶ 38} *Kelly* and *Cty. Rd. Assn.* are distinguishable from the case before us because the state constitutions in those jurisdictions do not contain an exception from referendum for legislation that raises revenue by imposing a tax levy. See Section 2, Article 16, Maryland Constitution; Section 9, Article 2, Michigan Constitution.

{¶ 39} In contrast, the Ohio Constitution specifically exempts laws providing for tax levies from referendum. Section 1d, Article II, Ohio Constitution. The electorate could have expressly excepted other means of raising revenue from referendum, but it did not. As we have consistently held, " '[t]he canon expressio unius est exclusio alterius tells us that the express inclusion of one thing implies the exclusion of the other.' " *Crawford-Cole v. Lucas Cty. Dept. of Job & Family Servs.*, 121 Ohio St.3d 560, 2009-Ohio-1355, 906 N.E.2d 409, ¶ 42, quoting *Myers v. Toledo*, 110 Ohio St.3d 218, 2006-Ohio-4353, 852 N.E.2d 1176, ¶ 24. In fact, if we were to read the appropriations exception to referendum as broadly as the intervening respondents advocate, the exception for tax levies would be meaningless because all means of raising revenue for government appropriations could be considered inextricably tied to appropriations.

{¶ 40} Our view is supported by the caselaw of other jurisdictions concluding that measures raising the revenue to be appropriated are not appropriations. See *Nicholson v. Cooney* (1994), 265 Mont. 406, 415-416, 877 P.2d 486 (rejecting the argument that a revenue-raising measure that was "inextricably tied" to appropriations legislation and that was used to balance the state budget fell within the appropriations exception to referendum); *Lawrence v. Beermann* (1974), 192 Neb. 507, 508-509, 222 N.W.2d 809 (explaining that the appropriations exception to referendum "should be and must be construed to

14

mean the ordinary running expenses of the state government and existing state institutions, and not to include money or appropriations or funds created or acts which have as their design a new or different scheme for * * * revenue raising and financing"); *Brooks v. Zabka* (1969), 168 Colo. 265, 270-271, 450 P.2d 653 ("The sales tax ordinance involved here is designed to raise revenue, not to provide for expenditures from public funds. * * * A sales tax ordinance is the exact antithesis of an appropriation" excepted from referendum); *Heinkel v. Toberman* (1950), 360 Mo. 58, 69, 226 S.W.2d 1012 (declining to construe a fuel tax as an appropriation, notwithstanding a separate constitutional provision requiring the funds generated by such taxes to be appropriated by the legislature for certain projects related to the state highway system).

### *Taft* and *Davies Mfg.*

{¶ 41} The intervening respondents rely on *State ex rel. Taft v. Franklin Cty. Court of Common Pleas* (1998), 81 Ohio St.3d 480, 692 N.E.2d 560, and *State ex rel. Davies Mfg. Co. v. Donahey* (1916), 94 Ohio St. 382, 114 N.E. 1037, in support of their argument that provisions of law that are inextricably tied to appropriations are exempt from referendum. This reliance, however, is misplaced.

{¶ 42} In *Taft*, we held that certain provisions of legislation imposing taxes to fund public schools were not subject to referendum although they did not appropriate money because implementation of those sections – calling for a statewide election on a proposed increase in the state sales and use tax – depended upon the appropriation of money for the election in a separate section of the same act. 81 Ohio St.3d at 484, 692 N.E.2d 560.

{¶ 43} Unlike the provisions at issue in *Taft*, the VLT provisions are not dependent upon any appropriation in H.B. 1. If anything, as the intervening respondents concede, the dependency is reversed: the appropriation of over $2.2 billion to the Department of Education from the Lottery Profits Education Fund is

dependent, in part, upon the projected revenues from the enactment of the VLT provisions. The VLT provisions are also not dependent upon the provision in Section 305.10 of H.B. 1 authorizing the office of the inspector general to use $50,000 of its operating expenses in each fiscal year to defray any expenses associated with reviewing the VLT operations. Section 305.10 does not implement the VLT sections, and the inspector general need not use any money to review VLT operations.

**{¶ 44}** Intervening respondents' reliance on *Davies Mfg.*, 94 Ohio St. 382, 114 N.E. 1037, is also misplaced. There, we held that a competitive-bidding requirement was not subject to referendum, because it was only a condition for an appropriation for the current expenses of the state government; it never became part of the permanent law.

**{¶ 45}** In *State ex rel. Ohio AFL-CIO v. Voinovich* (1994), 69 Ohio St.3d 225, 631 N.E.2d 582, we explained that " '[a]ny section of a law which changes the permanent law of the state is subject to referendum under the powers reserved to the people by Section 1 of Article II [of the Ohio Constitution], even though the law also contains a section providing for an appropriation for the current expenses of the state government and state institutions which under Section 1d, Article II, becomes immediately effective.' " Id. at 236, quoting *State ex rel. Riffe v. Brown* (1977), 51 Ohio St.2d 149, 167, 5 O.O.3d 125, 365 N.E.2d 876 (O'Neill, C.J., dissenting). As Chief Justice O'Neill observed in distinguishing *Davies Mfg.* in *Riffe*, which was overruled in *Ohio AFL-CIO*, 69 Ohio St.3d at 236, "[t]o give practical effect to the constitutional exception for appropriations, temporary provisions needed to implement the appropriation must also be effective immediately. But a change in the permanent law governing the people of Ohio, which incidentally may require an appropriation, is a wholly different matter." *Riffe*, 51 Ohio St.2d at 165.

**{¶ 46}** The challenged VLT provisions are not *temporary measures* that are conditions upon the appropriations made from the lottery profits education fund. The VLT sections of H.B. 1 *change* the permanent law of this state by, inter alia, defining VLTs, requiring the State Lottery Commission to promulgate rules establishing the licensees' minimum investments in buildings and grounds at the facilities where the VLTs will be located, barring new license or excise taxes on licensees after the effective date of the provisions, and purporting to vest exclusive, original jurisdiction in this court over any claims asserting that the VLT sections or any actions taken by the governor or State Lottery Commission pursuant to these sections are unconstitutional. Further, the amendment to R.C. 3770.03 permanently changes the law of Ohio by authorizing the Ohio Lottery Commission to operate VLT games, defined in proposed R.C. 3770.21(A) to mean "any electronic device approved by the state lottery commission that provides immediate prize determinations for participants on an electronic display."

**{¶ 47}** The changes to the permanent law of the state distinguish the instant case from *Taft* and *Davies Mfg.*, in which temporary measures were enacted to effectuate an appropriation. The VLT provisions at issue here constitute permanent changes that will be effective well after the biennium ends and are thus subject to referendum.

**{¶ 48}** A different section of the Ohio Constitution also supports our conclusion that the VLT provisions of H.B. 1 are not an appropriation. Section 22, Article II of the Ohio Constitution provides that "no appropriation shall be made for a longer period than two years." In contrast to this temporal limitation, the VLT provisions of H.B. 1 – R.C. 3770.03 and 3770.21 – do not expire in two years and are designed to become a permanent part of state law for purposes of generating state income. As such, these provisions are not appropriations.

{¶ 49} The plain language of Section 1d, Article II of the Ohio Constitution provides three limited exceptions to referendum: laws providing for tax levies, appropriations for the current expenses of the state government, and emergency laws necessary for the immediate preservation of the public peace, health, or safety, none of which expressly excepts changes to the permanent law of this state that provide a mechanism to raise revenue to provide funds for an appropriation. Courts are not authorized to add exceptions that are not contained in the express language of these constitutional provisions. Cf., e.g., *State ex rel. Stoll v. Logan Cty. Bd. of Elections*, 117 Ohio St.3d 76, 2008-Ohio-333, 881 N.E.2d 1214, ¶ 39 ("the statute contains no exception, and we cannot add one to its express language").

{¶ 50} The intervening respondents' interpretation of the appropriations exception would mean that even if the electorate repealed the tax-levy exception, laws providing for tax levies would remain excluded from referendum because they are "inextricably tied" or "related" to appropriations. In addition, under this interpretation of Section 1d, Article II of the Ohio Constitution, the General Assembly could presumably enact laws to raise revenue for appropriations by legalizing drugs or prostitution and thereby prevent the electorate from seeking referendum on the manner it chose to generate revenue to be used for an appropriation. This is not the meaning of Section 1d, Article II of the Ohio Constitution. See *State ex rel. Colvin v. Brunner*, 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979, ¶ 58 (courts have duty to construe constitutional provisions to avoid unreasonable or absurd results). Our duty is to construe the meaning of the plain language of the Constitution.

{¶ 51} Finally, we decline the invitation of the intervening respondents to address whether the State Lottery Commission is authorized to implement VLTs regardless of whether the challenged provisions of H.B. 1 are effective, because the parties have not submitted complete evidence and argument on this issue. We

confine our opinion here to only the narrower issue raised in this case regarding the rights of citizens to a referendum on the VLT provisions of H.B. 1. Furthermore, declining to address a legal issue not squarely before us is consistent with our reluctance to issue advisory opinions, the principle of judicial restraint, and our duty to liberally construe election laws in favor of the right to vote. *State ex rel. Myles v. Brunner*, 120 Ohio St.3d 328, 2008-Ohio-5097, 899 N.E.2d 120, ¶ 26, fn. 2, quoting *State ex rel. Barletta v. Fersch*, 99 Ohio St.3d 295, 2003-Ohio-3629, 791 N.E.2d 452, ¶ 22 (" 'we will not issue advisory opinions, and this rule applies equally to election cases' "); *PDK Laboratories, Inc. v. United States Drug Enforcement Admin.* (C.A.D.C.2004), 362 F.3d 786, 799 (Roberts, J., concurring in part and in judgment) (recognizing the "cardinal principle of judicial restraint – if it is not necessary to decide more, it is necessary not to decide more"); *Colvin*, 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979, ¶ 62 (noting the court's "duty to liberally construe election laws in favor of the right to vote").

**Conclusion**

{¶ 52} Accordingly, relators, LetOhioVote.org, Brinkman, Hansen, and Pierce, have established entitlement to the requested extraordinary relief in mandamus, and the secretary of state is directed to accept the submission of relators' referendum-petition summary and to discharge the duties of her office as provided by Article II of the Ohio Constitution and R.C. 3519.01.

{¶ 53} The video-lottery-terminal provisions of 2009 Am.Sub.H.B. No. 1 do not fall within any of the exceptions to the right of referendum in that they are neither laws providing for tax levies, nor appropriations for the current expenses of the state government, nor emergency laws necessary for the immediate preservation of the public peace, health, or safety. Therefore, they are subject to referendum.

{¶ 54} In conformity with our decision in *Ohio AFL-CIO*, 69 Ohio St.3d at 236-237, 631 N.E.2d 582, and as acknowledged by the respondents at oral argument, relators are entitled to an extension of the 90-day period in which to submit a referendum petition on the VLT provisions to the secretary of state. We therefore stay the amendments to R.C. 3770.03 and the enactment of R.C. 3770.21, which are the VLT provisions of H.B. 1, for 90 days from the date of this decision in order to allow relators a meaningful opportunity to circulate a referendum petition.

{¶ 55} Ours is still a representative democracy in which legislators derive their authority from the citizens of our state, who enjoy a constitutional right of referendum. While the Ohio Constitution expressly provides that appropriations for the current expenses of the state government are not subject to referendum, permanent changes to state law relating to such appropriations *are* subject to referendum. We are not unmindful of the effect our decision may have on the state budget, nor of the commendable efforts of the members of the executive and legislative branches of state government to fulfill their constitutional duties to balance the budget in Ohio; however, our own constitutional duty is to ensure compliance with the requirements of the Ohio Constitution irrespective of their effect on the state's current financial conditions.

Writ granted.

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, LANZINGER, and CUPP, JJ., concur.

PFEIFER, J., dissents.

_____

**PFEIFER, J., dissenting.**

{¶ 56} I would deny the writ.

{¶ 57} This case is truly one of first impression. Here, for the first time, this court is analyzing the state's biennial budget bill for the purpose of

determining citizens' right to seek referendum. Although this court has previously interpreted Sections 1c and 1d, Article II of the Ohio Constitution in *State ex rel. Riffe v. Brown* (1977), 51 Ohio St.2d 149, 5 O.O.3d 125, 365 N.E.2d 876; *State ex rel. Ohio AFL-CIO v. Voinovich* (1994), 69 Ohio St.3d 225, 631 N.E.2d 582; and *State ex rel. Taft v. Franklin Cty. Court of Common Pleas* (1998)*,* 81 Ohio St.3d 480, 692 N.E.2d 560, this case is different in that we are asked to interpret those sections in the context of the 2010-2011 budget bill. This difference alters the prism through which we must view the legislation in relation to referendum.

{¶ 58} The people's power of referendum set forth in Section 1c, Article II of the Ohio Constitution is limited by the General Assembly's power to raise and disburse funds pursuant to Section 1d, Article II. Section 1c, Article II of the Ohio Constitution provides:

{¶ 59} "The second aforestated power reserved by the people is designated the referendum, and the signatures of six per centum of the electors shall be required upon a petition to order the submission to the electors of the state for their approval or rejection, of any law, section of any law or any item in any law appropriating money passed by the general assembly."

{¶ 60} Section 1c, Article II does indeed allow referendum on appropriations, namely, "any item in any law appropriating money passed by the general assembly." But Section 1d, Article II limits referendum's reach:

{¶ 61} "Laws providing for tax levies, appropriations for the current expenses of the state government and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health or safety, shall go into immediate effect. * * * The laws mentioned in this section shall not be subject to the referendum."

{¶ 62} Appropriations for "the current expenses of the state government and state institutions" are the type of appropriations shielded from referendum.

The exceptions in Section 1d, Article II allow the legislature to budget without the uncertainty that referendum brings to the legislative process. Free from the threat of referendum, obligations and the means to fulfill those obligations are preserved with predictability. The exemption from referendum allows the state to make good on its liabilities; without it, the budget could remain in limbo for over a year, leaving the state unable to pay its "current expenses." With the shield from referendum, the business of the state moves forward, leaving budget-related legislation in place.

{¶ 63} The legislation contained in Am.Sub.H.B. No. 1 ("H.B. 1") related to video lottery terminals ("VLTs") is no mere legislative add-on, snuck into a mammoth bill. Instead, the VLT legislation is at the very heart of the budget bill, at the very heart of how Ohio is going to pay for its spending over the next two years. Without VLT-enabling legislation, the budget crumbles. Pursuant to H.B. 1, a $2.267 billion appropriation for schools is dependent upon the implementation of VLTs in Ohio. Without the income expected from VLTs, a large part of the funding for that appropriation vanishes, leaving an $851.5 million hole in the budget.

{¶ 64} The money to be raised by VLTs is directly and inextricably linked to a specific appropriation. R.C. 3770.06(B) requires net profits from all lottery functions—including proceeds from VLTs—to be deposited into the Lottery Profits Education Fund. For fiscal years 2010 and 2011, the budget bill requires that approximately $2.267 billion flow directly from the Lottery Profits Education Fund to local school districts according to the Foundation Funding formula. Line 200612 of the budget bill instructs that some $2.267 billion from the Lottery Profits Education Fund—more than $990 million in fiscal year 2010, and nearly $1.3 billion in fiscal year 2011—will go to local schools in the biennium. See H.B. 1 at 2797. At regular intervals throughout the budget period, monies are issued from the Lottery Profits Education Fund to the treasurer for disbursement

to school districts throughout the state. There is no commingling of funds—every cent of the estimated $851.5 million VLT revenue will go into the Lottery Profits Education Fund, and every cent of that fund will go to Ohio schools.

{¶ 65} With VLT-enabling legislation at risk of referendum, the General Assembly cannot make the appropriation from the Lottery Profits Education Fund that it had budgeted. To decimate the fund is to kill the appropriation that comes from that fund. There is no spending without a source of funds.

{¶ 66} The highest courts of Michigan and Maryland have held that a law that raises revenue and then appropriates it for a specific purpose is sheltered from the referendum power. *Cty. Rd. Assn. of Michigan v. Bd. of State Canvassers* (1979), 407 Mich. 101, 282 N.W.2d 774; *Kelly v. Marylanders for Sports Sanity, Inc.* (1987), 310 Md. 437, 530 A.2d 245. The Michigan Constitution exempts "acts making appropriations for state institutions" from the right of referendum. Section 9, Article 2. In *Cty. Rd. Assn.*, citizens sought referendum on legislation that increased taxes on motor vehicle fuel and vehicle weight. A separate bill established allocations for transportation projects. The Michigan Supreme Court held that the statutes establishing the taxes should be read in pari materia with appropriation statutes:

{¶ 67} " 'Statutes In pari materia are those which relate to the same person or thing, or the same class of persons or things, or which have a common purpose. It is the rule that in construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although enacted at different times, and containing no reference one to the other.' " *Cty. Rd. Assn.,* 407 Mich. at 119, 282 N.W.2d 774, quoting *Detroit v. Michigan Bell Telephone Co.* (1965), 374 Mich. 543, 558, 132 N.W.2d 660.

**{¶ 68}** The court held that the taxes and the expenditures for roadways "must be viewed as a comprehensive, single legislative program." *Cty. Rd. Assn.,* 407 Mich. at 118, 282 N.W.2d 774. The court pointed to the statements of the governor and to legislative history to establish the inextricable linkage between the taxing and appropriations statutes: "Both the Governor's stated approach and what legislative history is available suggest * * * 'a comprehensive system for the collecting of specific taxes on motor vehicles and motor vehicle fuels, the allocation of funds therefrom and the use thereof for (transportation) purposes.' " (Footnote deleted.) Id., quoting *Michigan Good Rds. Fedn. v. Alger* (1952), 333 Mich. 352, 360-361, 53 N.W.2d 481.

**{¶ 69}** Likewise, the highest court in Maryland has held that a "revenue raising and spending measure" is "embraced within the exclusionary provisions contained in the Referendum Amendment." *Kelly v. Marylanders for Sports Sanity, Inc.,* 310 Md. at 461, 530 A.2d 245. The Maryland Constitution exempts from the referendum power "appropriation[s] for maintaining the State Government." Section 2, Article XVI. The legislation involved in *Kelly* was a comprehensive scheme to raise funds to acquire land and construct sports facilities at Camden Yards for the Baltimore Orioles and a possible NFL team, including provisions authorizing the Stadium Authority to issue bonds to raise revenue for the project and a requirement that the State Lottery Agency conduct each year between two and four sports lotteries for the benefit of the Stadium Authority. *Kelly*, 310 Md. at 439-444, 530 A.2d 245. The court held that an untenable result would follow if the court attempted to detach the various provisions from one another. "Considered apart, the stadium bills would not be workable to achieve the objective of the appropriation," and to sever the provisions "would scuttle the entire project by fatally undermining its dominant purpose—to finance the acquisition of a site upon which to construct sports stadiums." *Kelly*, 310 Md. at 474, 530 A.2d 245. Accordingly, the court

concluded, the legislature intended for the provisions to "function in tandem as a unitary solution to its singular objective—an objective which it timed for immediate implementation." *Kelly*, 310 Md. at 473, 530 A.2d 245.

{¶ 70} These state supreme courts have correctly understood that the appropriations exception to the referendum power "has as its *constitutional* purpose protecting from referendum the purpose or object of the *legislative* appropriation." (Emphasis sic.) *Kelly*, 310 Md. at 472, 530 A.2d 245. It is the job of courts to determine whether the "dominant statutory objective" of the appropriation can be implemented without the supporting legislation. Id. The dominant statutory objective of the appropriation at issue in this case is the funding of the Lottery Education Fund and the concomitant funding of Ohio schools. Without the supporting VLT-enabling legislation, the objective of the appropriation cannot be implemented.

{¶ 71} The shield for appropriations from referendum is useless if the funding source of the appropriation is not also shielded from referendum. Otherwise, a tiny minority (in Ohio, six percent of the voting electorate, Section 1c) can suspend the operation of an otherwise valid appropriation by targeting its funding source for a referendum challenge. The resulting hole in the budget throws the entire finances of the state into disarray, affecting other appropriations.

{¶ 72} This case is about certainty in Ohio's budget. It is not about whether the governor and the General Assembly acted prudently in dismissing the people's will – demonstrated time and again at the ballot box – to keep slot machines out of Ohio. The budget crafted by the governor and enacted by the General Assembly cannot be overturned by referendum. However, the people retain the right to prohibit by constitutional initiative slot machines of any type or by any name. The governor and the individual members of the General Assembly remain answerable to the people through election.

**{¶ 73}** The chaos that may follow this court's decision today cannot be blamed entirely on the majority opinion, which applies a narrow but plausible interpretation of our constitution's limits on referendum.  The governor and the General Assembly have sown the wind, and now with a budget thrown into complete disarray, we shall all reap the whirlwind.

_____

Langdon Law, L.L.C., David R. Langdon, Thomas W. Kidd Jr., and Bradley M. Peppo; Jones Day, Michael A. Carvin, Douglas R. Cole, and Chad A. Readler, for relators.

Richard Cordray, Attorney General, and Richard N. Coglianese, Erick D. Gale, and Pearl M. Chin, Assistant Attorneys General, for respondent.

Richard Cordray, Attorney General, Benjamin C. Mizer, Solicitor General, Alexandra T. Schimmer, Chief Deputy Solicitor General, David M. Lieberman, Deputy Solicitor, and William C. Becker, Assistant Attorney General, for intervening respondents.

Maurice A. Thompson, urging granting of the writ for amici curiae the Buckeye Institute for Public Policy Solutions, Citizens in Charge, Coalition Opposed to Additional Spending & Taxes, Ohio Citizen Action, and the Ohio Freedom Alliance.

Matthew J. Burkhart and J. Michael Johnson, urging granting of the writ for amici curiae ATM Education, Buckeye Christian Schools Association, Church Coalition for Decency, Citizens for Community Values, Citizens Media Group/Christian Citizen USA, Constitution Party of Ohio, Eagle Forum of Ohio, Eischen Financial Group, Evangelical Fellowship Chapel, Family First PAC, Grove City Church of the Nazarene, Homemakers for America, Institute for Principled Policy, Jobs Plus Employment Network, Mission America, New Hope Christian Center, Ohio Governmental Prayer Alliance, Pass the Salt Ministries, Richland Community Family Coalition, the Ridge Project, Inc., Rocky Fork

Formulas, Inc., Sanctity of Life Foundation, Touch the World Ministry, Inc., Vandalia United Methodist Church, Victory in Truth Ministries, Women Influencing the Nation, Pastor Peter J. Foxx, Ronald Hood, Stephen J. Koob, Twyla Roman, and Pastor Wayne W. Scott.

Ulmer & Berne, L.L.P., and Donald J. Mooney Jr., urging denial of the writ for amici curiae Ohio Federation of Teachers, Ohio School Business Officials Association, Ohio Association of Public School Employees, Eve Bolton, and Jane Simon.

Vorys, Sater, Seymour and Pease, L.L.P., and Suzanne K. Richards, Richard D. Schuster, Michael R. Thomas, and Michael J. Hendershot, urging denial of the writ for amici curiae Ohio Council of Retail Merchants and Ohio Farm Bureau Federation.

_____