McGee Brown, J.,
dissenting.
{¶ 62} “The achieving of fair and effective representation for all citizens is * * * the basic aim of legislative apportionment.” Reynolds v. Sims, 377 U.S. 533, 565-566, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). In 1967, the people of this state amended Article XI of the Ohio Constitution to provide exacting detail on how legislative districts are to be drawn. Article XI outlines at length the priority to be given to keeping counties and local-government units whole and keeping existing district lines. However, today the majority upholds a redistricting scheme that Article XI was specifically designed to prevent. By elevating Section 10 (prescribing procedure for creating house districts) over the clear mandates of Sections 3 (population mandates) and 7 (retaining whole counties and governmental units), the majority permits respondents to elevate political considerations over Article XI.
{¶ 63} In a Maryland case involving a redistricting plan, the highest court in that state noted that “[bjecause it involves redrawing the lines of legislative districts, the process of reapportionment is an intensely political process. But it is also a legal one, for there are constitutional standards that govern both the process and the redistricting plan that results from it.” In re Legislative Redistricting of the State, 370 Md. 312, 320, 805 A.2d 292 (2002). The statement applies equally to Ohio’s reapportionment process. Although political considerations may affect the determination, they cannot control it in contravention of the specific standards set forth by the people of the state in Article XI.

The Recurring Apportionment Problem

{¶ 64} Relators claim that the apportionment plan adopted by respondents violates Article XI, Sections 7 and 11. These sections were adopted in 1967, and since their adoption, this court and federal courts have regularly addressed challenges concerning the apportionment plans adopted by the Ohio Apportionment Board following the decennial federal census. See, e.g., Parker v. State, 263 F.Supp.2d 1100 (S.D.Ohio 2003) (2001 apportionment plan); Voinovich v. Ferguson, 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992) (1991 apportionment plan); Quitter v. Voinovich, 981 F.Supp. 1032 (N.D.Ohio 1997) (1991 apportionment plan); Armour v. State, 775 F.Supp. 1044 (N.D.Ohio 1991) (1981 apportionment plan).
*239 {¶ 65} Former United States Senator William L. Marcy once said that “to the victors belong the spoils of the enemy.” http://www.bartleby.com/100/690.63.html. At the September 26, 2011 apportionment-board hearing, Auditor Dave Yost submitted for the record a portion of A Columnist’s View of Capitol Square, written by Lee Leonard, which observes that in 1971, when Democrats controlled the apportionment board, they created legislative districts that resulted in their party’s gaining control of both houses of the General Assembly, and that in 1991, when Republicans controlled the board, they created legislative districts that eventually resulted in their controlling both houses of the General Assembly.
{¶ 66} Consequently, neither party stands before this court with clean hands or intellectual purity. Each party has used the apportionment process for political gain with almost utter disregard for the dictates of Article XI.

General Principles

{¶ 67} Before turning to those matters upon which I disagree with the majority, I first note those matters with which I agree. I agree that we have jurisdiction over the merits of this case even though neither the apportionment board nor all of the board members are named as respondents. Ohio Constitution, Article XI, Section 13. I also agree with the general propositions specified in the syllabus concerning political neutrality; the initial burden of proof; the principle that when coequal Article XI provisions are irreconcilable, we will not order the apportionment board and its members to correct one constitutional violation by committing another; and the holding that Article XI, Section 7(D) is coequal with Article XI, Sections 7(A), (B), and (C).
{¶ 68} However, I respectfully dissent from the majority’s implicit determination that the subordinate procedure set forth in Section 10 takes priority over Sections 7(A) through (D). In other words, I disagree that Section 10’s procedure for creating house districts takes priority over Section 7’s requirements for keeping whole counties'and governmental units together.
{¶ 69} The 1967 amendment set forth a specific process for apportionment that would protect the integrity of governmental units by minimizing their division. By allowing respondents to elevate Section 10 over Section 7, the majority ensures that the apportionment process will become more political with each decennial plan.

Political Neutrality

{¶ 70} Although the text of Article XI does not specifically prohibit the use of political considerations in apportioning state legislative districts, the historical context of the constitutional apportionment provisions indicates that they were adopted to limit the importance of politics. As this court previously explained:
*240 Prior to the Constitution of 1851, the apportionments of legislative districts had been made by the General Assembly with the result that oftentimes political advantage was sought to be gained by the party in power. Accordingly Article XI was incorporated in the Constitution for the purpose of correcting the evils of former days by placing the power of apportionment in the hands of a board composed of the Governor, the Auditor of State and the Secretary of State and making the provisions self-acting.
% * *
The objective sought by the constitutional provisions was the prevention of gerrymandering. By creating a board of ex officio members and adopting self-acting provisions it was sought to place the function of apportionment in impartial hands and at the same time mark the way so that in the main at least the provisions of the Constitution would work automatically and the apportioning process ordinarily would be a mere matter of calculation.
State ex rel. Herbert v. Bricker, 139 Ohio St. 499, 508-509, 41 N.E.2d 377 (1942). See also Steinglass & Scarselli, The Ohio State Constitution: A Reference Guide 279 (2004) (Article XI “was included in the 1851 Constitution to prevent gerrymandering, a common practice in the first fifty years of statehood”).
The purpose of the people in enacting Article XI is clear. It was to place legislative apportionment in the hands of a separate board not subject to the control of the General Assembly, the board to be composed of representatives of the people, elected by the people and unconnected with the legislative branch of government.
State ex rel. King v. Rhodes, 11 Ohio St.2d 95, 99, 228 N.E.2d 653 (1967).
{¶ 71} Respondents claim that the foregoing precedent is no longer applicable because in 1967, Ohio amended Article XI to comply with the one-person-one-vote principle of cases like Reynolds v. Sims, 377 U.S. at 568, 84 S.Ct. 1362, 12 L.Ed.2d 506, and Nolan v. Rhodes, 378 U.S. 556, 84 S.Ct. 1906, 12 L.Ed.2d 1034 (1964).
{¶ 72} It is true that the 1967 amendment to Article XI eliminated many of the automatic and self-acting provisions that characterized the version contained in the 1851 Constitution and its 1903 amendment so that General Assembly districts could be apportioned on a substantially equal-population basis. But by no means *241 did the new provisions harken a return to the old days of political gerrymandering that the Article was originally adopted to eliminate.
{¶ 73} Instead, the 1967 amendment set forth mandatory, nonpartisan criteria to be used by the apportionment board in reapportioning state legislative districts. See, e.g., Article XI, Sections 3 (population of house districts), 4 (population of senate districts), 5 (single member for each district), and 7 (boundary lines for house districts).
{¶ 74} Furthermore, contrary to respondents’ assertion, the 1967 amendment’s inclusion of “partisanly-elected political officials]” on the apportionment board did not contemplate a “political process by design” any more than did the 1851 version’s inclusion of the governor, auditor, and secretary of state on the apportionment board.
{¶ 75} The 1967 amendment simply did not change the objective of Article XI — to prevent the political gerrymandering engendered by leaving the apportionment process entirely to the political party controlling the General Assembly. And to determine the soundness of the challenged apportionment plan, we “look not only to the letter of the constitutional provisions but to their spirit and purpose.” Herbert, 139 Ohio St. at 508, 41 N.E.2d 377.
{¶ 76} In sum, then, while Article XI does not require political neutrality in the apportionment process, partisan considerations cannot prevail over the nonpartisan requirements set forth in Article XI.

Burden of Proof

{¶ 77} I agree with the majority that the initial burden of proof is on the party challenging the constitutionality of an apportionment plan to establish that the plan is unconstitutional beyond a reasonable doubt. And I agree that in the absence of evidence to the contrary, we presume that the apportionment board and its members performed their duties in a lawful manner.
{¶ 78} However, as the United States Supreme Court recently observed in a case upholding the individual mandate of the Patient Protection and Affordable Care Act, “[o]ur deference in matters of policy cannot * * * become abdication in matters of law.” Natl. Fedn. of Independent Business v. Sebelius, — U.S.-, 132 S.Ct. 2566, 2579, 183 L.Ed.2d 450 (2012). I would hold that any presumed validity of the apportionment plan is rebutted when relators establish that the plan violates the provisions of Article XI of the Ohio Constitution. Under these circumstances, we must review the applicable constitutional provisions without deference to the apportionment board.
{¶ 79} Respondents claim that after proving that the plan is unconstitutional beyond a reasonable doubt, relators must establish beyond a reasonable doubt that the apportionment board also acted without a rational basis. This contention *242 lacks merit. As relators note, if a plan is unconstitutional, it cannot be resuscitated by reliance on a nonconstitutional criterion, e.g., retention of an incumbent or political composition. Acting on such a factor would not be rational. See In re Reapportionment of the Colorado Gen. Assembly, — P.3d -, 2011 WL 5830123 (Colo.2011) at *3 (“Other nonconstitutional considerations, such as the competitiveness of a district, are not per se illegal or improper; however, such factors may be considered only after all constitutional criteria have been met”).
{¶ 80} Moreover, one of the cases respondents cite for this proposition is In re Reapportionment of Towns of Hartland, Windsor, & W. Windsor, 160 Vt. 9, 624 A.2d 323 (1993), but the Vermont Supreme Court noted in that case that “once petitioners have shown that the State has failed to meet constitutional or statutory standards or policies with regard to a specific part of the plan, the State then has the burden to show that satisfying those requirements was impossible because of the impermissible effect it would have had on other districts.” Id. at 16. Other states have also shifted the burden of proof to the parties responsible for the apportionment plan to justify their departure from certain constitutional provisions once relators established that the plan is unconstitutional in some respect. See In re Legislative Districting of the State, 370 Md. at 368, 805 A.2d 292 (when apportionment plan raised sufficient issues with respect to its compliance with state constitutional requirements, court placed burden of proof on the state to justify the plan); In re Reapportionment of Colorado Gen. Assembly, 45 P.3d 1237, 1241 (Colo.2002) (court held that if an apportionment plan does not comply with the county-boundary requirement of the Colorado Constitution, the reapportionment commission must make an adequate factual showing that less drastic alternatives could not have satisfied the equal-population constitutional requirement); In re Legislative Districting of Gen. Assembly of Iowa, 193 N.W.2d 784, 791 (Iowa 1972) (state failed to sustain burden of proof to show why state legislative reapportionment plan could not comply with state constitution’s compactness requirement).
{¶ 81} This approach is logical. The respondents who crafted and approved the apportionment plan are in the best position to know the basis for any noncompliance with Article XI.
{¶ 82} Therefore, I would hold that once relators make a prima facie showing beyond a reasonable doubt that respondents have violated a provision of Article XI of the Ohio Constitution, the burden of proof shifts to respondents to justify that violation based on the avoidance of a violation of another superior or coequal legal requirement.

Article XI, Sections 3, 7, and 10

{¶ 83} In our briefing order, we asked whether tension existed among Sections 3, 7, and 10 of Article XI of the Ohio Constitution, and if so, how these sections should be harmonized. 131 Ohio St.3d 1468, 2012-Ohio-848, 962 N.E.2d 800.
*243 {¶ 84} The plain language of the subsections in Section 7 establishes that Section 7 is subordinate to the population requirements of Section 3: Section 7(A) directs the apportionment board to draw the boundary lines of house districts to delineate an area “containing one or more whole counties” “[t]o the extent consistent with the requirements of section 3”; Section 7(B) directs the apportionment board to create districts by combining the areas of governmental units in the order specified “[w]here the requirements of section 3 of this Article cannot feasibly be attained by forming a district from a whole county or counties [as prescribed in division (A)]”; Section 7(C) directs the apportionment board to divide only one governmental unit between two house districts in the order specified “[w]here the requirements of section 3 of this Article cannot feasibly be attained by combining the areas of governmental units as prescribed in division (B) of this section”; and finally, Section 7(D) directs the apportionment board to adopt the house-district boundaries established by the preceding apportionment “to the extent reasonably consistent with the requirements of section 3 of this Article.” Consequently, there is no conflict — inherent or otherwise — -between the requirements of Sections 3 and 7 because, by its very terms, Section 7 is subordinate to the population requirements of Section 3.
{¶ 85} Similarly, there is no conflict between Section 10 and Sections 3 and 7. The introductory language in Section 10 makes clear that the substantive standards set forth in Sections 3, 7, 8, and 9 govern the creation of house districts and that the procedure specified in Section 10 applies only insofar as it is consistent with those standards: “The standards prescribed in sections 3, 7, 8, and 9 of this Article shall govern the establishment of house of representatives districts, which shall be created and numbered in the following order to the extent that suck order is consistent with the foregoing standards.” (Emphasis added.) Ohio Constitution, Article XI, Section 10.
{¶ 86} Therefore, under the plain language of these sections, if there is a conflict, Section 3 prevails over Sections 7 and 10 and Section 7 prevails over Section 10.
{¶ 87} I agree with the majority that Sections 7(A) through (C) are coequal with Section 7(D). Sections 7(A) through (C) require that every house district be compact and contiguous and, to the extent it can do so and still meet the requirements of Section 3, that it contain one or more whole counties; and if the district cannot be made out of a whole county or counties and still meet the requirements of Section 3, then it must be formed by combining the areas of local governmental units in the order specified in Section 7(B), and if the requirements of Section 3 cannot feasibly be attained by combining the areas of local governmental units, then they must be divided, giving preference for division as specified in Section 7(C), and only one local governmental unit may be divided *244 between two districts. Section 7(D) requires that district boundaries established by the preceding apportionment be used to the extent reasonably consistent with the requirements of Section 3. Because Sections 7(A) through (C) are coequal with Section 7(D), when the sections cannot simultaneously be satisfied, the apportionment board may determine which of the provisions to follow. See Voinovich, 63 Ohio St.3d at 200, 586 N.E.2d 1020.

Respondents’ Contentions

{¶ 88} Respondents contend that their apportionment plan should not be analyzed on the district-by-district basis set forth in relators’ complaint and briefs. According to respondents, with whom the majority implicitly agrees, “the boundaries of districts created at the end of the [apportionment] process are greatly affected by decisions made in districts created earlier,” so that any constitutional violations in the latter districts are within the board’s discretionary authority to make. This claim — which equates to “because we have already violated the constitution, we can continue to violate the constitution” — lacks merit. The procedure in Section 10 is subordinate to the substantive constitutional requirements in Sections 3 and 7(A), (B), (C), and (D) of Article XI.
{¶ 89} Nor is there any merit in respondents’ claim that the court should not consider Professor Michael McDonald’s alternative plans because they were not presented to the board. The court is not determining whether respondents should have adopted one of the alternative plans. Instead, we are determining whether respondents complied with the applicable requirements of Article XI. Nothing in the Ohio Constitution or other applicable law prevents this court from considering all relevant evidence in that regard.
{¶ 90} Respondents also raise a host of justifications for their violations of various provisions of Article XI, including that they had no duty to minimize divisions of governmental units in adopting their apportionment plan. Their argument completely ignores the plain language of Sections 7(A), (B), and (C), which require minimal divisions to the extent possible without violating the population requirements of Section 3.
{¶ 91} Respondents further contend that they were justified in violating Article XI where they attempted to comply with Sections 3, 7(D), and 10. However, there is nothing in Section 3 that permits respondents to violate Sections 7(A), (B), and (C) to make the populations of districts more “substantially equal.” Instead, if the board can make districts that comply with both Section 3 and Sections 7(A) through (C), they have a duty to do so. That is, respondents can violate Sections 7(A), (B), and (C) based on Section 3 only when complying with both sections is not feasibly attainable. Respondents’ focus on Sections 7(D) and 10 completely ignores the requirements of Sections 7(A) through (C).
*245 {¶ 92} Section 7(D) does not — as respondents claim — give them license to change district borders any way they see fit in purported compliance with a requirement to keep a district’s boundaries substantially similar to the district’s previous boundary lines. Instead, as relators note, as long as the Section 3 requirements are met, Section 7(D) specifies that the district boundaries “shall be adopted.” And if the Section 3 requirements are not met by the prior district, Section 7(D) does not require that the board adopt substantially similar boundary lines.
{¶ 93} The majority’s interpretation of Section 7(D) authorizes innumerable violations of Sections 7(A), (B), and (C) by allowing unnecessary divisions of governmental units based on a nonexistent requirement that the boundaries of new districts be substantially similar to those in the preceding apportionment districts. By applying a malleable standard of substantial adherence to previous district lines, an apportionment board could condone a myriad of violations of Article XI to achieve partisan gain. The citizens of Ohio could not have intended this absurd result when they adopted Section 7(D). State ex rel. LetOhioVote.org v. Brunner, 123 Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 50 (court has duty to construe constitutional provision to avoid unreasonable or absurd result).

Article XI, Section 7(A)

{¶ 94} Article XI, Section 7(A) specifies that “[t]o the extent consistent with the requirements of section 3 of this Article [requiring that the population of each house district be substantially equal to the house’s ratio of representation and in no event less than 95 percent nor more than 105 percent of the ratio], the boundary lines of districts shall be so drawn as to delineate an area containing one or more whole counties.”
{¶ 95} Notwithstanding the clear language of this provision, relators have established that for several house districts in the apportionment plan adopted by the board, respondents divided counties when it appears it was unnecessary to do so to meet the population requirements of Article XI, Section 3.[1] In violation of Section 7(A), House Districts 70, 78, 84, 91, 94, and 95 were created by dividing certain counties when such divisions were not necessary to satisfy Section 3 population requirements. As the apportionment board’s joint secretaries’ own analysis of the board’s plan establishes, the division of Holmes County for House District 70, Athens, Pickaway, and Muskingum Counties for House District 78, Auglaize and Shelby Counties for House District 84, Ross County for House District 91, Athens, Vinton, and Washington Counties for House District 94, and *246 Washington County for House District 95 are not required by the applicable provisions of Article XI. And the alternative apportionment plans submitted by relators’ expert, Professor McDonald, prove that an apportionment plan need not violate Section 7(A) by splitting these counties.[2]
{¶ 96} Respondents attempt to justify their division of these counties and concomitant violation of Section 7(A) by relying on Sections 10(C) and (D). But Sections 10(C) and (D) should not be applied if they conflict with Section 7(A). The introductory language in Section 10 makes clear that the substantive standards set forth in Sections 3, 7, 8, and 9 govern the creation of house districts and that the procedure provided in Section 10 applies only insofar as it is consistent with those standards. See also The Ohio State Constitution: A Reference Guide 286 (“section 10 prescribes the method for creating house districts subject to the population requirement of section 3 and the preference for creating districts out of whole counties in sections 7-9 ” [emphasis added]). Because Sections 10(C) and (D) — in the manner that respondents applied them here — are inconsistent with the application of Section 7(A) regarding House Districts 70, 78, 84, 91, 94, and 95, respondents cannot rely on Sections 10(C) and (D) to justify their violation of Section 7(A) in dividing the specified counties. Unlike the provisions at issue in Voinovich, 63 Ohio St.3d at 200, 586 N.E.2d 1020, Section 10 is not coequal with Section 7, and thus, respondents were not permitted to remedy the conflict by ignoring Section 7.
{¶ 97} For example, with regard to House District 70, respondents attempt to justify their plan’s violation of Section 7(A) based on Section 7(D), citing paragraph 88 of Heather Mann’s affidavit in support of this argument. But this paragraph from Mann’s affidavit cites only Sections 10(C) and 10(D) and does not support respondents’ claim that Section 7(D) required their split of Holmes County in creating the house district.[3]
{¶ 98} On the record before this court, relators have established beyond a reasonable doubt that respondents violated Article XI, Section 7(A) by unnecessarily dividing the specified counties in House Districts 70, 78, 84, 91, 94, and 95.

Article XI, Sections 7(B) and (C)

{¶ 99} Article XI, Section 7(B) provides, “Where the requirements of section 3 of this Article cannot feasibly be attained by forming a district from a whole county or counties, such district shall be formed by combining the areas of *247 governmental units giving preference in the order named to counties, townships, municipalities, and city wards.” And under Article XI, Section 7(C), “Where the requirements of section 3 of this Article cannot feasibly be attained by combining the areas of governmental units as prescribed in division (B) of this section, only one such unit may be divided between two districts, giving preference in the selection of a unit for division to a township, a city ward, a city, and a village in the order named.”
{¶ 100} Respondents contend that their apportionment plan does not violate Sections 7(B) and 7(C), because Article XI does not require the apportionment board to put all noncontiguous portions of a governmental unit into one district. Thus, they claim that their plan divides only 15 governmental units. The board’s plan defines a noncontiguous area as an area that is “legally or technically a portion of a geographic unit,” but is “surrounded by other land-based geographic units.” In formulating their plan, respondents determined that if a governmental unit was noncontiguous, the board could put its separate portions into different districts and not count this as a division of the governmental unit because the governmental unit had been divided by local officials through annexation. Respondents are correct in pointing out that previous apportionment boards followed this same logic, but they admit that this issue has never been resolved in litigation.
{¶ 101} For the following reasons, I disagree with respondents’ contention that these divisions of governmental units do not count as divisions.
{¶ 102} First, the plain language of Sections 7(B) and (C) does not authorize differing treatment of contiguous and noncontiguous governmental units. These sections do not distinguish between contiguous and noncontiguous governmental units, including counties, townships, municipalities, cities, city wards, or villages, so the plain, broad language of these constitutional provisions must apply to both. See State ex rel. Colvin v. Brunner, 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979, ¶ 49 (“R.C. 3503.06 makes no distinction between entitlement to vote in person or by absentee ballot at an election, so its plain, broad language must apply to both”); State ex rel. Ohio Democratic Party v. Blackwell, 111 Ohio St.3d 246, 2006-Ohio-5202, 855 N.E.2d 1188, ¶ 14, quoting Consumer Electronics Assn, v. Fed. Communications Comm., 347 F.3d 291, 298 (D.C.Cir.2003) (“As United States Supreme Court Chief Justice John G. Roberts Jr. previously observed in a unanimous opinion for the United States Court of Appeals for the District of Columbia Circuit, ‘the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application’ ”).
{¶ 103} Second, notwithstanding respondents’ argument, “[c]ourts are not authorized to add exceptions that are not contained in the express language of *248 these constitutional provisions.” State ex rel. LetOhioVote.org v. Brunner, 123 Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 49. Therefore, we cannot except noncontiguous governmental units from the application of Article XI, Sections 7(B) and (C) when the express language of those provisions does not contain such an exception.
{¶ 104} Third, although Section 7(A) requires that every house district be “composed of contiguous territory” with the boundary of each district being a “single nonintersecting continuous line,” there is no evidence — or argument by respondents — that applying the plain language of “governmental units” in Sections 7(B) and (C) to include both contiguous and noncontiguous would result in a violation of Section 7(A) for the creation of house districts. See Parella v. Montalbano, 899 A.2d 1226, 1253 (R.I.2006) (“Contiguity generally means that districts are bordering, adjoining, or touching”). To the contrary, relators’ reapportionment and redistricting expert, Professor McDonald, created two apportionment plans that each split less than half the number of political subdivisions split by respondents’ apportionment plan, without violating Section 7(A).
{¶ 105} Fourth, this plain-language construction of Sections 7(B) and (C) to prefer the inclusion of whole governmental units and to avoid the splitting of even noncontiguous governmental units in apportioning state legislative districts is logical. As relators note, although noncontiguous political subdivisions may be separated geographically, “they share common issues, services, and political concerns.” And they are generally represented by the same officials.
{¶ 106} Fifth, we need not approve an erroneous construction of a constitutional provision simply because it has always been construed erroneously, particularly when it has not previously been litigated. Doing so would protect an unconstitutional practice.
{¶ 107} Sixth, respondents’ claim that invalidating their apportionment plan in this case “would wreak havoc on the apportionment process now and in the future” by jeopardizing the state’s compliance with the Voting Rights Act, 42 U.S.C.1973, is simply not true.
{¶ 108} Relators have met their burden of proof.

Article XI, Section 7(D)

{¶ 109} Section 7(D) provides that “[i]n making a new apportionment, district boundaries established by the preceding apportionment shall be adopted to the extent reasonably consistent with the requirements of section 3 of this Article.” (Emphasis added.)
{¶ 110} Relators have established that respondents violated Section 7(D) in creating new House Districts 60, 61, 84, and 91 by altering the boundaries for *249 house districts established by the 2001 apportionment. The preceding district boundaries did not require modification to comply with the population requirements of Section 3. In fact, respondents’ evidence does not suggest that Section 3 mandated an alteration of the prior district boundaries for these districts.
Wesp, Barwell, Pierre-Louis, L.L.C., and Lloyd Pierre-Louis; Murray & Murray Co., L.P.A., and Dennis E. Murray Jr.; and Perkins Coie, L.L.P., and Marc Erik Elias, Kevin J. Hamilton, Abha Khanna, and Noah Guzzo Purcell, for relators.
Baker & Hostetler, L.L.P., John H. Burtch, E. Mark Braden, and Robert J. Tucker, for respondents Governor John Kasich, Senate President Thomas E. Niehaus, and Auditor David Yost.
Michael DeWine, Attorney General, and Pearl M. Chin, Assistant Attorney General, for respondent Governor John Kasich.
Michael DeWine, Attorney General, and Renata Staff, Assistant Attorney General, for respondent Auditor David Yost.
Michael DeWine, Attorney General, and Sarah Pierce, Assistant Attorney General, for respondent Senate President Thomas E. Niehaus.
Michael DeWine, Attorney General, and Richard N. Coglianese, Michael J. Schuler, and Erin Butcher-Lyden, Assistant Attorneys General, for respondent Secretary of State Jon Husted.

Conclusion

{¶ 111} “The purpose of the people in enacting Article XI is clear. It was to place legislative apportionment in the hands of a separate board not subject to the control of the General Assembly, the board to be composed of representatives of the people, elected by the people and unconnected with the legislative branch of the government.” King, 11 Ohio St.2d at 99, 228 N.E.2d 653. “The objective sought by the constitutional provisions was the prevention of gerrymandering.” Herbert, 139 Ohio St. at 509, 41 N.E.2d 377. In practice, however, whichever political party has a majority of the members of the apportionment board uses apportionment to favor its partisan interests. The majority’s decision today ensures that this will continue.
{¶ 112} I respectfully dissent.
O’Connor, C.J., concurs in the foregoing opinion.

. Because relators have met their burden of proof for these violations, the burden should shift to respondents to show that the violations were necessary to comply with other superior or coequal sections.

. I am not suggesting that respondents must adopt Professor McDonald’s plan, but am merely pointing out that relators have met their burden in demonstrating that violating Section 7(A) was unnecessary.

. In the interest of brevity, I do not address each of the violations alleged by relators but use House District 70 as an illustration of the apportionment plan’s multiple violations of Section 7(A).